Suit by Willie R. Davie against William Sperling and wife and others for specific performance of a contract to sell realty. From a decree for specific performance, defendants appeal.
Decree affirmed.
The appellee, Willie R. Davie, brought suit against Daniel Walton and William Sperling and their respective wives for specific performance of a contract executed by the Waltons, who agreed to sell him certain property for $5,000, $500 to be paid in cash and the remainder upon receipt of an abstract showing that they held marketable title to the land.
Three portions of the agreement should be stressed because they furnish bases for the questions of law determined by the lower court and now presented to us. In the first it was agreed that the property was "being sold and purchased with the understanding that the purchaser [would] furnish a home for the sellers [Waltons], free of rent and taxes, and comfortable, as long as they both [should] live"; in the second, if the deal was not consummated within a month after delivery of the abstract, the sum paid in cash should be "retained by the seller * * * as liquidated and agreed damages * * *"; and in the third, if the title was found unmarketable or, if defective, was not made marketable within a reasonable time, all moneys paid should be returned unless the buyer accepted the faulty title.
After extensive testimony before the master on the issues formed by the bill and answer he filed an exhaustive report based on a painstaking study of the evidence, which we now undertake to condense.
The Waltons were an aged, infirm, and illiterate couple who had owned and occupied the property for many years. Because of their incapacity to earn a livelihood they wished to sell it to someone who would provide them a home for the rest of their lives and relieve them of the burden of taxes. The appellee, Willie R. Davie, offered to pay them the $5,000 and construct a home for them which would be free from rent and taxes and which they could occupy as long as they lived. The offer and the offerer both being acceptable, the Waltons then instructed their agent to consummate the deal. Consequently on October 21, 1946, the contract which we have already described was prepared, and on November 11, 1946, it was executed, the sellers receiving at the time the sum of $500. The abstract was delivered to the appellee the early part of the month of December, and upon examination, it was discovered that on November 21, 1946, the Waltons had entered into a similar contract with the Sperlings, appellants. When appellee asked Daniel Walton the *Page 320 
reason for the later contract his explanation was that the Sperlings had offered $6,000 for the property and had paid $1,000 in cash.
On two occasions between the execution of the first and the second contracts the sellers informed William Sperling that they had already signed the contract to sell the property to appellee. The master states in unequivocal language that the testimony established "beyond any shadow of a doubt" that the Sperlings had actual knowledge of the sale of the property to the appellee when they induced the Waltons to sell to them. He found as a motive for their persuading the Waltons to sell to them, despite the outstanding contract, that they were to lose the lease on adjacent property where they operated a store and were desperately in need of another location in the vicinity.
The master was convinced, too, that the Sperlings undertook to buy the property for the same price and for the same cash payment as appeared in Davie's contract and when they failed in this effort, raised the amount of the purchase price and the deposit.
The contract executed in behalf of the Sperlings contained this provision, which corresponds with the one incorporated in the contract with Davie: "Subject further to the condition that * * * Daniel Walton and Annie Walton, his wife, shall be provided living quarters, free of rent, in the rear of this property, during [their] lifetime * * *." Then follows this language, which in the light of facts already detailed becomes quite significant: "The location of said living quarters to be at the selection of the Grantee so as not to interfere with any new structures to be erected by the grantee * * *."
After this very suit was instituted and lis pendens filed, indeed after summons in it had actually been served on the Sperlings, they proceeded to take possession of the property and start construction of a dwelling for the Waltons and a commercial building for their own use. This they admit.
When the report reached the chancellor he confirmed the findings and the recommendations and ordered the Waltons to perform the contract with Davie upon payment by him of the remainder of the purchase price. He declared the purported contract with the Sperlings, as well as the deed given pursuant to it, fraudulent as the result of conspiracy, and ordered them canceled. He decided that the title taken under them was held by the grantees in trust for Davie without any interference with the Waltons' possession of the dwelling on the rear of the property, and he retained jurisdiction to determine the value of this dwelling, which the Sperlings had built.
The appellants have posed four questions. The first of these challenges the court's decree that the original contract be enforced because, it is urged, the liability which should attach in the event of a breach of contract by either party was stated in the instrument itself, where it was provided in effect that if the purchaser failed to comply with its terms by a certain date the down payment of $500 should be retained by the sellers, while if the sellers should fail to comply, this amount should bereturned. As we understand the appellants' argument in support of this position, it simply means that for the remedy of specific performance, which might otherwise be available to the buyer in the event of a breach of contract by the sellers, there would be substituted the remedy of recovering that which he had paid. This seems to us to come perilously close to arguing that the sellers, after entering into a solemn agreement, could glibly dishonor it and restrict the buyer to regaining what was in practical effect already his, inasmuch as the transaction was not consummated and the sellers were therefore not entitled to the money.
There is no need to pursue the matter further for the simple reason that the facts do not coincide with the situation which was contemplated by the provisions with reference to the sellers' default. Let us now analyze it. They were to furnish an abstract showing good title and if, upon examination, it was found not to be merchantable, were to use reasonable diligence to perfect it within a reasonable time, and if, after exercising this diligence, the title should not be made marketable within *Page 321 
a reasonable time, any moneys paid by the buyer should be returned and he should be released from his obligations or should have the option of taking the title in its then condition. Obviously the breach of this contract upon the part of the sellers did not result from the state of the title, but on the contrary, the sellers, after connivance with the Sperlings, deliberately violated it for the sole purpose of obtaining a higher price for the property. In these circumstances they cannot rely upon that part of the contract with reference to the return of the money and totally disregard the conditions on which the so-called remedy of the buyer to regain what he had paid was based. In other words, even if the contract had not been consummated because of the condition of the title and the buyer's sole redress had been the recovery of the amount paid, his restriction to this remedy would not obtain where the breach was solely the result of bad faith on the part of the sellers.
The appellants now assail the contract between the Waltons and the appellee on the ground that its terms are so vague, general, and uncertain as to be incapable of specific performance, but they had filed no motion to dismiss, and in their answer simply denied the execution of the prior contract with appellant. In support of this position they name seven reasons why the contract is indefinite, and all of them pertain to its provisions with reference to furnishing the Waltons a comfortable home, free of rent and taxes. Here again we see no need of digesting the various authorities on the subject of definiteness required in contracts if they are to be enforced in equity because this part of the first contract certainly cannot be said to be more indefinite than the corresponding provision in the abortive contract executed between the appellants-Sperling and the appellants-Walton, and certainly they should not now be heard to complain. The provisions are very similar. To repeat, the first referred to a comfortable home, free of rent and taxes, while the second referred to living quarters in the rear of the property, free of rent. Not only that, but the final decree which we have already analyzed specifically referred to the building constructed on the the property in question by the appellants-Sperling and occupied by the appellants-Walton, and expressly reserved to the latter, as long as either of them should live, the use and occupancy of that dwelling, free of rent and taxes.
As the Waltons have accepted and occupied a dwelling constructed by the Sperlings, and as the Waltons are to be secure in the possession of this property regardless of the outcome of this suit, it is inconceivable how either the Waltons or the Sperlings can seriously complain about the indefiniteness of the provision in the first contract which the Waltons violated in conspiracy with the Sperlings.
The remaining question posed by the appellants involves the hardship which is placed on the Sperlings by the decree and the compensation to which they should be entitled for the improvements they made. They knew full well when they importuned the aged owners to sell them the property at an advanced price that a commitment to sell it had already been made to the appellee. Even with a suit pending to which they were parties and to which they had been summoned, questioning the title to this very property because of the outstanding contract, they took the risk of making improvements. Their actions naturally did not commend themselves to a court of equity, and we find no fault with what the master found or the chancellor decreed.
It should be emphasized that the chancellor retained jurisdiction of the cause, not only to determine the value of the dwelling constructed by the Sperlings for the Waltons, for which doubtless he considers the Sperlings should be reimbursed by Davie, but he also retained jurisdiction further to make orders with reference to the balance of the purchase price which the appellee is required to pay into the registry of the court, a provision which, we apprehend, he made in order that the total of the moneys paid by Davie under his contract should eventually reach the Sperlings. We are utterly unable to see where the appellants-Walton have any just complaint about the decree, as they seem to have been abundantly protected by it. *Page 322 
So far as the Sperlings are concerned, it is our view that they were simply "hoist with their own petard."
Affirmed.
ADAMS, C.J., and TERRELL and BARNS, JJ., concur.