Clyde R. YAIST

v.

The UNITED STATES

v.

OLSON FLORIDA REALTY CO.

No. 214–77.

United States Court of Claims.

July 29, 1981.

James D. Murray, Lakeland, Fla., for plaintiff; Thomas M. Gittings, Jr., Washington, D. C., attorney of record.

John R. Hill, Jr., with whom was Acting Asst. Atty. Gen., Anthony C. Liotta, Washington, D. C., for defendant; Walter J. Postula, Washington, D. C., of counsel.

Paul M. Laurenza, Washington, D. C., for third-party defendant, Olson Florida Realty Co.; William C. Brashares, Washington, D. C., attorney of record.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

## OPINION

DAVIS, Judge:

This just compensation case, tried before former Trial Judge Browne, concerns the title to some property located in the Florida Everglades. The trial judge ruled that the plaintiff's property had been taken and that compensation was owing in an amount to be determined in a separate trial. We agree with that determination but for somewhat different reasons.[1]

### I

Both the United States and the plaintiff, Clyde R. Yaist, claim title to the same property through purchase, and the merits of the case turn on the recordation-notice law of Florida. In 1968, Olson Florida Realty Company (Olson or Olson Realty), the third party defendant, executed to Yaist Agreements for Deed for two tracts of land, amounting to some 50 acres, within the boundaries of the Everglades National Park. In the spring of 1971, as set forth *infra*, Olson Realty purported to sell, by warranty deed, these same tracts as well as others, in an amount totalling 1186.25 acres, to the United States, through the National Park Service of the Department of the Interior. The Government bought the land pursuant to 1970 Congressional authorizations for the purchase or condemnation of the remaining inholdings (privately owned property) within the Everglades Park boundaries. Pub.L.No.91–428, 84 Stat. 885 (1970) (amending the original act; codified at 16 U.S.C. §§ 410–410r–4 (1976)).

Olson first executed an Agreement for Deed to Yaist, dated May 10, 1968, for 35 acres (tracts 42, 44 and 46), and later exe-cuted another, dated July 18, 1968, for 15 acres (tract 35).[2] Yaist did not record either of these Agreements in the public records in Monroe County, Florida. By warranty deed of June 10, 1968, Yaist conveyed to South Polk Corporation (South Polk), a Florida corporation, title to approximately 9.2 acres of the 35 acre tract, subject to Yaist's outstanding Agreement with Olson. Later, by a warranty deed of January 29, 1971, Yaist conveyed part of the 15 acre tract to Nauti-Buoy, Inc., (Nauti-Buoy).[3] This deed was recorded on February 5, 1971. On March 10, 1971, C. A. Boswell, Jr., a Florida attorney (who was a stockholder of South Polk), apparently acting on Yaist's behalf, filed several papers in the official records of Monroe County. He filed the warranty deed of June 1968 from Yaist to South Polk, the July 18, 1968 Agreement for Deed from Olson to Yaist for the 15 acres, and an affidavit. The affidavit attached copies of all three Agreements for Deed from Olson to Yaist (*see supra*, text at n.2 and n.2).

Meanwhile, the United States proceeded to purchase and condemn property in the Everglades. It negotiated with Olson Realty for the purchase of Olson's property, including the 50 acres already sold to Yaist. In preparation for closing the transaction with Olson, the Government obtained a title insurance policy, on December 18, 1970, from Louisville Title Insurance Company through its agent, Monroe Land Title Co., for the 1186.25 acres being purchased. As of that date, none of the transactions involving Yaist had been recorded or filed. Closing was delayed for various reasons until April 28, 1971, and the Government re-

1. The court adopts the trial judge's findings of fact as modified by the order entered this day. We do not print the findings. Any facts found in this opinion, but not contained in the formal findings, are to be considered as additional findings of fact.

2. Both the 35 and the 15 acre tracts are located within Section 19, Township 54 South, Range 31, East, Monroe County, Florida. Much of the property consisted of submerged land.

　Prior to execution of the two Agreements for Deed relevant to the present litigation, Olson Realty had executed an Agreement for Deed bearing date of August 26, 1966, in which it agreed to convey to plaintiff Tract 41 (approximately 10 acres) in the same Section, Township, Range, and County, and also lying within the boundaries of the Everglades National Park. This tract was the subject of a condemnation action in the United States District Court for the Southern District of Florida and is not included in the present action.

3. This deed to Nauti-Buoy was for about 4125 square feet (25 by 165 feet).

corded its deed from Olson the next day. The United States paid Olson $100.00 per acre for the property. No title search was performed between December 18, 1970 and the April 28, 1971 closing. By April 1971, however, Boswell and others had filed the various papers described above. Neither Olson nor the United States was aware before closing of these filings and recordations (and therefore neither Olson nor the Government had express actual notice). The Government's title company, by indorsement dated May 20, 1971, guaranteed the title as of April 30, 1971, without having seen or referred to the instruments previously recorded or filed after December 1970.

Yaist first had actual notice of the conflicting claims to his property when he received a copy of a letter sent by the Monroe County tax assessor, dated October 28, 1971, calling attention to the conflicting property interests. By letter of June 13, 1972, the National Park Service, in response to a letter from the plaintiff, told him that the Government had taken title to the property and that Yaist should look to Olson Realty for a solution. Yaist continued to make payments on the property as required under the Agreements for Deed with Olson, and to pay the property taxes until 1975. He filed his petition here in April 1977, claiming that the Government's assertion of ownership of his property amounts to a taking for which compensation is due him.

Defendant objects to the trial judge's conclusion favorable to plaintiff on the grounds that (1) we lack jurisdiction because there was no taking under 28 U.S.C. § 1491; (2) the plaintiff lacks a compensable interest in the property, and (3) the Government purchased the property as a bona fide purchaser for value and without notice of plaintiff's claim. We address these points in parts II–V, *infra*.

II

■ A. This court has jurisdiction over Fifth Amendment taking cases under 28 U.S.C. § 1491 (1976) (amended Supp. III 1979). *E. g., United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946). Defendant claims, however, that no taking has occurred and that this case should properly be heard by the District Court for the Southern District of Florida in an action to quiet title under 28 U.S.C. § 2409a(a) (1976).

The Quiet Title Act, 28 U.S.C. § 2409a(a), does not apply to or affect "actions which may be or could have been brought under" section 1491. *Bourgeois v. United States*, 212 Ct.Cl. 32, 545 F.2d 727 (1976), which is binding on us, indicates that this suit was properly brought under section 1491 for an alleged constitutional taking. There, the claimant said that she held title to an island until the United States appropriated it. She based her claim on her purchase of lake-shore property that the Government patented to a private citizen in 1866. The defendant alleged that it owned the island at the time of suit and always had, since its 1866 patent for land on shore did not include the island. The issue was therefore which party had title to the island. The court noted that the plaintiff could appropriately try title in a just compensation suit, because the Quiet Title Act specifically excepted actions that could be brought under 28 U.S.C. § 1491. 212 Ct.Cl. at 35–36, n.1, 545 F.2d at 729, n.1, citing *Malone v. Bowdoin*, 369 U.S. 643, 647, n.8, 82 S.Ct. 980, 983, n.8, 8 L.Ed.2d 168 (1962) and *Carlson v. United States*, 208 Ct.Cl. 1022, 1023 (1976). *Malone, supra*, dismissed an ejectment suit against a federal officer (brought on the ground that the Government did not own the land while the claimant did) but observed that a suit in the Court of Claims against the Government for just compensation would have been appropriate, and *Carlson, supra*, which was decided after enactment of the Quiet Title Act, specifically held that plaintiffs could try title in a suit for just compensation.

In the case now before us, a dispute over title arises because Olson Realty conveyed to Yaist Agreements for Deed for certain lots and to the United States warranty deeds for the same lots. As in *Bourgeois*, a holding that the United States was the true

owner of the property and that Yaist had no valid claim would mean that there had been no taking. But, as in *Bourgeois,* a cause of action arises for the plaintiff under the Fifth Amendment through his allegation that he, and not the Government, holds the valid title.

It may be that there could be no suit in this court for a taking if the United States expressed no interest in the property. But *Bourgeois* held it enough to show a taking—if plaintiff prevailed on the merits—that the Government "posted" the island as government land and sent the plaintiff's attorney a letter to the same effect. In the current case, the Government comparably expressed its desire to retain the land by filing its deed with the county records office on April 29, 1971, and by a letter of June 13, 1972, sent by Philip O. Stewart of the Department of the Interior, telling Yaist that "by virtue of the April 28 conveyance the United States is the owner of record of the lands in question." Moreover, defendant's counsel represented to this court at oral argument that the Government wanted and still wants this land, and would pay for it under the condemnation provisions of the Quiet Title Act (28 U.S.C. § 2409a(b)) if this case were brought in district court under that statute.[4]

The Government invokes *Hilkovsky v. United States,* 205 Ct.Cl. 460, 504 F.2d 1112 (1974). That court found no taking even though the Government was proceeding very slowly in obtaining plaintiffs' land— consisting of privately owned plots within the proposed boundaries of the Point Reyes National Seashore. Although the Government had filed condemnation suits, it had never claimed title to the claimant's land. The current claim of present ownership, which goes beyond the purpose to acquire property in the future (*Hilkovsky*) or beyond the impact of any reduction in the marketability of property due to possible future acquisition (*see Pitman v. United States,* 211 Ct.Cl. 357, 358 (1976)), is what brings the Government's conduct in this case within our jurisdiction.

■ To the extent that it may be necessary in "taking" cases to find or infer an authorized governmental intent to acquire and keep the property, that is certainly present here: (1) Congress has authorized the acquisition or condemnation of this very property; (2) the Government announced to plaintiff (by letter) and also to the world (by filing the deed from Olson to it) that the property is its; (3) the Government, for some time and currently, has consistently desired to retain the property and would acquire it if it were held to belong to plain-

4. This representation is supported by defendant's letter to Olson dated June 1, 1970, saying, "If you had not agreed to convey voluntarily it would have been necessary to acquire your property by condemnation." The record also establishes that there was Congressional authority to obtain the land either by negotiation or condemnation. In addition, the Department of the Interior sent letters to Yaist, one a form letter addressed to "Landowner" and one specifically to Yaist, dated November 22, 1971 and May 10, 1972, alerting Yaist to expect his land to be appraised prior to acquisition by the Government.

The significance of the posting in *Bourgeois* was that it gave notice to the plaintiff and all the world of the Government's claim of ownership. This claim, when questioned by that plaintiff in court, gave us jurisdiction over the case as one seeking just compensation for land allegedly taken. The fact that in *Bourgeois* the Government's signs were physically posted on the land provides no ground for distinguishing the current case. The posting does not amount

to the kind of physical intrusion, such as a flooding or military bombardment, that provides the basis for taking claims in other contexts. *See, e. g. Eyherabide v. United States,* 170 Ct.Cl. 598, 601, 345 F.2d 565, 567 (1965). It seems apparent that, even in a situation in which the Government placed notices on the edge of but still within what was indisputably its own adjacent property, and those signs announced ownership of a neighbor's land lying beyond the signs, there would still be a taking under *Bourgeois* although there had been no physical touching of the neighbor's land. It is the interference with the title to the land through a legally authorized assertion of ownership that constitutes the taking. *Cf. Carlson v. United States,* 214 Ct.Cl. 1, 8, 556 F.2d 489, 493 (1977) (the Government's failure to assert title to or interest in the land in controversy barred a taking, although a cloud on the title may well have resulted from unauthorized claims to the land by Indian wards of the Government).

tiff. *Bourgeois*, among a host of other cases, shows that it is unnecessary for defendant to have a specific intent to take the property away from another owner whom it recognizes as the legitimate owner.[5]

■ B. Although this court has jurisdiction over the claim against the United States, it lacks jurisdiction to grant relief against Olson Realty, which was brought in as a third-party defendant under section 14(b) of the Contract Settlement Act of 1944, 41 U.S.C. § 114(b) (1976). The case is not what the defendant contends it is, a simple instance of money paid to the wrong party under a mistake of fact or law and which the Government now seeks to recover. It might well have been such a case if the Government had filed a Declaration of Taking (under 40 U.S.C. § 258a (1976)), paid a claimant, and was later sued by the rightful owner. *See Maryland Casualty Co. v. United States*, 135 Ct.Cl. 428, 141 F.Supp. 900 (1956) (a contractor's assignee was properly brought in once the Government paid it money from a fund later claimed by the plaintiff, a bonding company which had paid certain bills of the contractor). Instead, the Government purchased property from Olson Realty under a warranty deed. Any claim the defendant may have against Olson would be based upon the warranty clause in that deed. Under our cases, when the Government's claim against the third party rests upon an indemnity by the third party to the Government, we have no jurisdiction of that claim. *E. g. Bowser, Inc. v. United States*, 190 Ct.Cl. 441, 420 F.2d 1057 (1970), reconsidered on other grounds, 192 Ct.Cl. 377, 427 F.2d 740 (1970); *Christy Corp. v. United States*, 181 Ct.Cl. 768, 387 F.2d 395 (1967). The plaintiff appears to have dropped any claims he might once have made against Olson in this forum, and we would, in any case, lack jurisdiction to adjudicate them. *Rolls-Royce Ltd. v. United States*, 176 Ct.Cl. 694, 698, 364 F.2d 415, 417–18 (1966). We leave to the determination of any other forum in which the question may arise what the collateral estoppel effect may be of Olson's having participated in the litigation now before us.

### III

The Government also raises the defense that, whatever defects there may be in the federal title, Yaist has in any event no compensable interest in all or part of the property. Defendant gives three reasons: (1) Yaist lacks even equitable title; (2) he sold some of the land; and (3) the property consists (in substantial part) of submerged land under navigable water to which the Government already has ownership rights without the need for any acquisition.

■ A. Yaist claims that he has an equitable title to the property under Florida law.[6] Under that law, a contract providing for the long-term sale of realty with payments to be made over time normally creates an equitable conversion, giving the purchaser beneficial title to the property but leaving legal title with the seller. *E. g. Hull v. Maryland Casualty Co.*, 79 So.2d 517, 518 (Fla.1954).

The Government argues, however, that unless the underlying contract for deed is specifically enforceable by both parties there can be no equitable conversion. On the assumption that an equitable conversion will occur only where both parties can specifically enforce the contract, two clauses in the Agreements for Deed between Yaist and Olson raise a question. These clauses say: (1) if the seller cannot give good title he shall return all monies to the purchaser and be relieved from all obligations (the "return" clause); and (2) if the buyer fails to make payments the contract may be terminated and the seller shall retain all payments as liquidated damages (the "retain" clause). These are said by defendant to confine the parties' remedies and thus to bar specific performance.

---

**5.** In inverse condemnation it is never necessary to show that the United States intended to take the property *by eminent domain*.

**6.** Since we find that Yaist does have a property right through the doctrine of equitable conversion, we need not address other possible property rights which might have been taken by the Government.

■ But in circumstances akin to those of the present case, the Florida courts have held that these provisions do not bar specific performance. Where, as here, the buyer has tendered the purchase price,[7] specific performance can be allowed the purchaser despite the "retain" clause (which in that situation is not interpreted as the seller's sole and exclusive remedy). *Vance v. Roberts*, 96 Fla. 379, 118 So. 205 (1928). *See, also, Romines v. Nobles*, 55 So.2d 563 (Fla. 1951).[8] As for the "return" clause, we read *Sperling v. Davie*, 41 So.2d 318 (Fla.1949), as holding that that provision does not bar specific performance where the seller is unable to deliver, not because of defects in his title, but simply because he thereafter sells the land to another.

■ Under Florida law, then, the Agreements for Deed gave the plaintiff more than mere executory contract rights, even before final payment was made. They created an equitable conversion, vesting equitable title in him, an interest that includes the full value of the property to which he holds equitable title. This issue of the extent of the vendee's right under Agreements for Sale has arisen in the context of several eminent domain proceedings in Florida, and the courts have held that the equitable owner gets the benefit or loss of condemnation or eminent domain. *Arko Enterprises, Inc. v. Wood*, 185 So.2d 734, 737–41 (Fla.Dist.Ct.App.1966); *J. C. Penney Co. v. Koff*, 345 So.2d 732, 736 (Fla.Dist.Ct. App.1977); *see also Hauben v. Harmon*, 605 F.2d 920, 925–26 (5th Cir. 1979); 2 Nichols, *Law of Eminent Domain* § 5.21[1] (rev. 3d ed. 1980). It follows that Yaist, as the equitable owner of this property, is entitled to just compensation for the taking of it, if his interest was adequately protected under Florida law (*see* Part IV, *infra*).

B. The Government also contends that, because much of the property is submerged or subject to the ebb and flow of the tide, there are and can be no private property rights in it. Since the resolution of this issue is so dependent on the facts of this case, there are no findings on this issue, and it is as closely tied to the question of damages as to the issue of liability, we leave the question to the trial judge to determine on remand. Similarly, we leave to the trial judge a determination as to which maps ought properly to be used in locating plaintiff's property.

■ C. Finally, the Government is not liable to Yaist for property the latter sold prior to the date of taking. Yaist sold a twenty-five foot strip of the fifteen acre property to Nauti-Buoy by warranty deed of January 29, 1971. Previously he sold 9.2 acres of the thirty-five acre tract to South Polk by Warranty Deed of June 10, 1968. Yaist thus transferred all of his interest in these segments of the property prior to the earliest date alleged by any party to be the date of governmental taking. Yaist has no standing to claim payment for them. Compensation can be paid only to the person who owns or has an interest in the property at the time it is taken. *United States v. Dow*, 357 U.S. 17, 20–21, 78 S.Ct. 1039, 1043–1044, 2 L.Ed.2d 1109 (1958); *Thomas v. United States*, 205 Ct.Cl. 623, 631–32, 505 F.2d 1282, 1286 (1974). South Polk and Nauti-Buoy are not parties to this action and of course cannot recover here.[9]

IV

The problem on the merits is whether the Government was, or should have been, sufficiently on notice of Yaist's equitable ownership of the land so as to prevent its subsequent acquisition from being untainted.

---

**7.** Olson admits that Yaist has paid the purchase price in full, albeit full payment was made after Olson's sale to the Government. We so find. There is also sufficient proof that he earlier tendered the full price.

**8.** It seems plain that the clause in the Agreements saying that the buyer had no personal

liability would likewise not bar specific performance if he has tendered the full price.

**9.** Both Nauti-Buoy and South Polk were notified of their opportunity to appear as third parties pursuant to Rule 41 of this court. Neither appeared or asserted any claim or interest in the subject matter of the suit.

A. The relevant section of the Florida Recording Statute provides, 39 Fla.Stat. Ann. § 695.01(1) (West 1969):

(1) No conveyance, transfer or mortgage of real property, or of any interest therein, nor any lease for a term of one year or longer, shall be good and effectual in law or equity against creditors or subsequent purchasers for a valuable consideration and without notice unless the same be recorded according to law * * *.

The proper recordation of Yaist's interest would protect him against subsequent purchasers even if they lack any kind of factual notice of his interest. In Florida there are two kinds of notice, "constructive" and "actual" (the latter is divided into "express" and "implied"). The Florida Supreme Court defined these kinds of notice in *Sapp v. Warner*, 105 Fla. 245, 141 So. 124, *aff'd on rehearing*, 143 So. 648, 144 So. 481 (Fla. 1932):

"Constructive notice" has been defined as notice imputed to a person not having actual notice; for example, such as would be imputed under the recording statutes [from properly recorded instruments in the chain of title] to persons dealing with property subject to those statutes. "Actual notice" is also said to be of two kinds: (1) Express, which includes what might be called direct information; and (2) implied, which is said to include notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use, or, as it is sometimes called, "implied actual notice." * * * Constructive notice is a legal inference, while implied actual notice is an inference of fact, but the same facts may sometimes be such as to prove both constructive and implied actual notice.

141 So. at 127 (citations omitted).

The Florida recording legislation requires that the clerk of the circuit court for each county record all instruments in a series of books called "Official Records," and keep "a general alphabetical index, direct and inverse, of all instruments filed for record." 5 Fla.Stat.Ann. § 28.222(2) (West 1973). Deeds are indexed both by grantors and by grantees.[10] Given this indexing system, a purchaser doing a proper title check must examine the index and records to insure a clear title in his grantor, and then check to see if his grantor has otherwise disposed of the property that the purchaser wants to buy. In this way, he determines the status of the property's chain of title. In the case before us, for example, the Government as purchaser was required to check all activity into and out of Olson (its grantor), recorded in the county files, concerning the 15 and 35 acre lots.

The problem arises mainly from the triple facts that (a) the title search on which the Government relied was conducted in December 1970 but (b) the closing of the defendant's purchase from Olson did not take place until April 28, 1971, and (c) almost all of the recorded items on which plaintiff relies were filed in the more than four-months interim period. There is no adequate excuse for the Government's failure to have a further, second search made before the actual closing. The elapsed time was quite long, and it seems unreasonable to assume that no pertinent filing would be made in that period.[11] It is not enough that Mr. Olson gave an affidavit that his company owned the property he was selling free and clear of any relevant encumbrances and clouds. *Applefield v. Commercial Standard Ins. Co.*, 176 So.2d 366, 377 (Fla.Dist.Ct. App.), *cert. denied*, 183 So.2d 209 (Fla.1965). Defendant is therefore charged with constructive notice of all items correctly recorded (which involved its grantor, Olson, and the lots with which we are concerned), and with implied actual notice of any item it should have come across if it had made a

---

10. There is no indication in the record that the county also had an index by lot, or that the Government or its title searcher had such an index or ought to have used one.

11. There is a good indication that the Government was entitled (under its agreement with its title insurance company) to a further search much closer to the actual closing, but it is clear that the Government never received one.

non-negligent search shortly before the closing.

We turn now to the particular filings which are alleged to have given the defendant such notice.

■ B. We first put aside those items (pressed upon us by plaintiff) that the Government cannot be charged with finding even if it had made a proper search. The most important is the affidavit and attachments filed by Boswell (on behalf of Yaist) on March 10, 1971. Though Boswell's affidavit did attach copies of the very relevant Agreements for Deed between Olson and Yaist for the land involved, we cannot charge the Government with any direct notice of those documents because the record is wholly silent as to the indexing of the Boswell affidavit and attachments. They may well have been indexed only under Boswell, the affiant, which would obviously have been outside any area of proper governmental search. *See Coggins v. Mimms*, 373 So.2d 964, 965 (Fla.Dist.Ct.App.1979) (affidavit indexed only under buyer's name and without acknowledgment by the seller gave no notice of alleged seller's interest in property). Plaintiff has the burden of showing that the Boswell affidavit and attachments were recorded in such a way as to provide notice to subsequent searches by purchasers of the Olson land. *See Pierson v. Bill*, 138 Fla. 104, 189 So. 679, 684 (1939); *McCahill v. Travis Co.*, 45 So.2d 191 (Fla.1950). This burden has not been borne.[12] Nor has plaintiff made any showing that a title searcher has a duty to examine documents in the record book that happen fortuitously to be filed near an instrument the searcher is under an obligation to find. If such a searcher actually chances upon an instrument, it would give express actual notice of the fortuitously discovered document. But absent any duty to look hither and yon, we cannot find either constructive or implied actual notice. *See In re Estate of Donner*, 364 So.2d 742, 750 (Fla.Dist.Ct.App.1978).[13]

■ C. Boswell also separately filed on March 10, 1971, a copy of the Agreement for Deed for 15 acres on Lot No. 35 (dated July 18, 1968) from Olson to Yaist.[14] This was obviously within the defendant's chain-of-title and, if it were an original (or certified copy), would give the Government proper constructive notice. We agree with defendant that uncertified copies are not entitled to recordation and do not give constructive notice as a matter of law in Florida, but we think that they can give implied actual notice (if in fact they appear in the records) to one, like the Government here, who negligently fails to make a proper search when he should. Florida holds that filed documents can give actual notice to one who sees them even though constructive notice cannot be had because of improper recordation. *Lassiter v. Curtiss-Bright Co.*, 129 Fla. 728, 177 So. 201, 203 (1937).[15] This rule apparently applies as

---

**12.** The plaintiff does not even claim in this case that the attachments and affidavit were also indexed under Olson, the Government's seller.

**13.** There were also filed separately, and properly recorded, the deeds from Yaist to Nauti-Buoy and from Yaist to South Polk. It is, however, doubtful that a proper search by the Government should have included these documents. Because these deeds did not emanate from Olson (defendant's grantor), a searcher would not find them indexed under Olson either as grantor or grantee. These instruments could therefore be said to be outside of the Government's chain-of-title, and it is established in Florida that a searcher need not ordinarily look beyond documents in his chain-of-title. *E. g. Poladian v. Johnson*, 85 So.2d 140 (Fla.1955). *See also* note 22, *infra*.

**14.** It is not absolutely clear that this recorded Agreement was a copy, but the trial judge so found (though his opinion refers to it as an original) and Boswell testified that he never had access to the originals of documents he filed. On the whole we find that the instrument filed was an uncertified copy.

**15.** As we see it, the chief difference in this context between pure constructive notice and implied actual notice in Florida is that the latter can be found as a matter of fact if the purchaser has been negligent while the former is applied as a matter of law regardless of the reasonableness of the purchaser's behavior (but only when the instrument giving such constructive notice is properly recorded and in the purchaser's chain of title).

well when the actual notice is merely implied—for instance when a search ought to have been made but was not, and the instrument that would have been seen was therefore missed. *McCausland v. Davis*, 204 So.2d 334, (Fla.Dist.Ct.App.1967), *cert. denied*, 212 So.2d 869 (Fla.1968). Nor do we agree with defendant that the rule permits implied actual notice only from properly recorded documents. *Sackheim v. Marine Bank & Trust Co.*, 341 So.2d 247, 249 (Fla. Dist.Ct.App.1976).[16] To hold otherwise would negative the distinction Florida draws between constructive notice and implied actual notice, and would sanction the negligent failure to make a search. Florida indisputably permits a finding of express actual notice against those who see an improperly recorded instrument. *Lassiter, supra*, 129 Fla. 728, 177 So. 201. We cannot say that the state courts would permit one who ought to have seen an instrument but negligently failed to do so to take advantage of his negligence and "shut his eyes or ears to avoid information, and then say that he has no notice * * *." *Sapp v. Warner, supra*, 105 Fla. 245, 141 So. 124, 127, *aff'd on rehearing*, 143 So. 648, 144 So. 481 (Fla. 1932).

In the present case, had the Government made the proper search of the records that it ought to have made, it would have found in ordinary course the copy of the July 18, 1968 Agreement for Deed for 15 acres from Olson Realty to Yaist. This document would have put it on implied actual notice

that an original deed most probably existed, and that those 15 acres were apparently no longer Olson's to convey to defendant.

■ D. The issue remains whether the Government was also on notice of Yaist's claim to the 35 acre property, the Agreement for Deed (from Olson to Yaist) of which was not recorded at all (apart from Boswell's affidavit).[17] We start this inquiry from the premises, already determined *supra*, that (a) the Government was negligent in not having a title check made during the period from December 1970 to April 28, 1971, and (b) if a proper search had been made shortly before the April closing date the Government would have been on notice of the July 18, 1968 Agreement for Deed from Olson to Yaist for the 15 acre tract.

Olson's earlier Agreement to sell the 15 acre lot to Yaist should have made the Government suspicious. The circumstances should have encouraged and added to that suspicion. These 15 acres were part of the property that Olson did not originally claim to own but that the Government told him he did in fact own.[18] The Government's list led Olson to offer about 1235 acres for sale, a figure that was whittled down to 1186.25 acres once Olson located various unrecorded but outstanding Agreements for Deed. This whittled-down 1186.25 acres was apparently still more than Olson originally offered to sell. We do not know how much more than Yaist's fifty acres the extra land included.[19]

16. Originally, implied notice appears to have been used only for specific referrals from properly recorded documents to other documents. *Gradolph v. Ricou*, 104 Fla. 237, 139 So. 579 (Fla.1932); *Sapp v. Warner*, 105 Fla. 245, 141 So. 124, *aff'd on rehearing*, 143 So. 648, 144 So. 481 (Fla.1932). However, Florida cases have applied the rule to impute knowledge based on referrals to sources other than documents. E. g., *McCausland v. Davis*, 204 So.2d 334 (Fla. Dist.Ct.App.1967), *cert. denied*, 212 So.2d 869 (Fla.1968); *Tri-County Produce Distributors, Inc. v. Northeast Production Credit Ass'n*, 160 So.2d 46, 51 (Fla.Dist.Ct.App.1963) (*see* Part IV, D, *infra*.)

17. We have already held in Part IV, B, *supra*, that no notice can be attributed to the Government through the mere filing of the Boswell affidavit and its attachments. The reason is

that there is no showing and no reason to believe that either the affidavit or its attachments were indexed under any name other than Boswell.

18. Olson initially gave the Government a list of the land he believed he owned. After a title search, a civil engineer, employed by the National Park Service and acting on its behalf, advised Olson that he was the record owner of more land than Olson had listed. Olson then eliminated from the Government's expanded list certain parcels that were subject to outstanding Agreements for Deed, but he did not eliminate Yaist's property.

19. We shall refer to the land Olson had previously agreed to sell to others as "extra."

All this should have made the Government doubly suspicious once it discovered (as it should have) the July 1968 Agreement for Deed for the 15 acres. A mistake as to these 15 acres would have suggested to a reasonably prudent buyer that Olson might have been right in the first place, and did not in fact own all the land he was selling to the Government. These suspicions should have led the Government into undertaking a further inquiry.[20]

Florida recognizes the need for further inquiry in circumstances we consider comparable. *Applefield v. Commercial Standard Ins. Co., supra,* 176 So.2d 366, 377 (Fla.Dist.Ct.App.1965).[21] *Applefield* thus describes the principle: "Means of knowledge, with the duty of using them, are in equity equivalent to knowledge itself. * * Where there is a duty of finding out and knowing, ignorance resulting from a negligent failure to perform the duty has the same effect in law as actual knowledge." (citation omitted). *See also Delesdernier v. O'Rourke & Warren Co.,* 305 F.2d 929, 931–32 (5th Cir. 1962). The *Applefield* opinion

does not limit that rule to fraud cases, and we have no adequate reason to do so. If, as we think is true in the current case, there was strong reason to pursue the inquiry further, the Government as purchaser should have done so, even if it meant going outside the public records.[22] *See Tri-County Produce Distributors, Inc. v. Northeast Production Credit Ass'n,* 160 So.2d 46, 51 (Fla.Dist.Ct.App.1963); *McCausland v. Davis, supra,* 204 So.2d at 336.

A reasonably prudent buyer-to-be would at the very least have sought, in the circumstances, more information from Olson or from Webb Realty (Olson's agent) before going to closing.[23] The "means of knowledge," *Applefield, supra,* 176 So.2d at 377, available to the Government were to ask Olson or Webb about the Agreement with Yaist for the fifteen acres and to require a more thorough search through their files and memories for additional information about the true status of the remaining extra land. Although no more information might be forthcoming we consider that highly unlikely.[24] There is enough in the

---

**20.** In addition, Boswell wrote to the National Park Service in January 1970 saying he had acquired property in Section 19, asking for photographs or maps of the area (apparently he was referring to the land bought by South Polk from plaintiff).

**21.** In that case, the plaintiff took, as security for a loan, assignments of notes he erroneously believed, on the basis of affidavits by his assignee, to be first mortgages. The court said that he "was in possession of information sufficient to put him on inquiry which would have disclosed the fraud." 176 So.2d at 378. Specifically, he knew that the title insurance company had not made a title search when it issued insurance binders to him although language on the binders required it to do so, and knew that there were prior encumbrances on the property (this knowledge was imputed to plaintiff through his attorney). In those circumstances, the plaintiff should have checked the record for himself rather than rely on the affidavit of the person who was deceiving him. 176 So.2d at 377–378. Had he checked, he would have learned that the prior encumbrances had not been removed.

**22.** We by-pass plaintiff's argument that the Government, as purchaser, was required to search for recorded instruments from Yaist to others, such as South Polk and Nauti-Buoy. (If that search had been made here it would clear-

ly have revealed the Agreement for Deed of the 35-acre lot.) There is doubt that Florida requires any search for recorded documents out of a prior purchaser (from one's potential grantor) of the land one expects to buy for oneself. *See* note 13, *supra.* Once such a prior acquisition is found, that is normally enough to upset the sale to the proposed buyer who is doing the search, and Florida may hold that transfers by such a prior acquirer are irrelevant and need not be looked at by new prospective buyers.

If, however, our doubts about this aspect of Florida law were resolved in plaintiff's favor, and the Government were called upon to look for Yaist's deeds to South Polk and Nauti-Buoy, it is indisputable that the Government would have then become fully aware of Yaist's prior interest in the 35 acre lot.

**23.** Mr. Panton, defendant's attorney for the real estate closing with Olson, admitted at trial that he would not have gone to closing had he been aware of the documents Boswell recorded and attached to his affidavit.

**24.** It has not been alleged that Olson acted in bad faith. Indeed, Olson did not initially claim to own the land now in controversy. It is most probable that, once shown the 15-acre Agreement for Deed with Yaist and with the need to

record to support our holding (consistent with Florida law) that the Government should have made further inquiry and, if it had done so, would probably have discovered the prior sales to plaintiff of the 50 acres.[25] The Government's failure to pursue this course of action deprives it of the status of a bona fide purchaser without notice of Yaist's interests in the 35 acre lot. (We have already held *supra*, Part IV, C, that the defendant has the same tainted status as to the 15-acre tract.)

## V

The result is that, by its acquisition and retention of the plaintiff's property without the status of a bona fide purchaser, the United States has taken it and just compensation is due Yaist. The case is remanded to the Trial Division for determination, under Rule 131(c) and pursuant to this opinion, of the date of the taking, the identification of the precise property taken, and the amount of compensation.

## CONCLUSION OF LAW

On the findings and the foregoing opinion, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Rule 131(c). Defendant's contingent claim against third-party Olson Florida Realty Company is dismissed.

look further limited to documents concerned with the "extra" property (however much that was), either Olson or Webb would have recalled the remaining Agreement to Yaist (concerning the 35-acre lot) and informed the Government about it.

25. We need not consider whether the alleged presence of cabins on the property should have, in addition to or independently of the factors already mentioned, caused the Government to make inquiries into their ownership. It is also unnecessary to consider at this time if the $100 per acre that the Government paid to Olson for these 50 acres, among others, constitutes the necessary valuable consideration that a bona fide purchaser must pay to maintain his title. Yaist asserts that it is inadequate compensation for the property including the cabins, for which he now claims $350,000.