RICHMOND, FREDERICKSBURG
AND POTOMAC RAILROAD
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–750L.

United States Court of Federal Claims.

Nov. 24, 1992.

Howard H. Stahl, Washington, DC, with whom were John R. Labovitz, Robert C. Barber, and John M. Shoreman, Steptoe & Johnson, for plaintiff. Charles A. Hartz, Jr., Vice President and Gen. Counsel of Richmond, Fredericksburg and Potomac R. Co., of counsel.

Stephan J. Odell, Washington, DC, with whom was Asst. Atty. Gen., Vicki A. O'Meara, for defendant. M. Kevin Voyles, Office of the Sol., Dept. of the Interior, of counsel.

## OPINION

NETTESHEIM, Judge.

Richmond, Fredericksburg and Potomac Railroad Company brought this action for breach of contract and a taking in violation of the fifth amendment. The case is before the court after argument on cross-motions for summary judgment. To resolve this case, the court must interpret a 1938 indenture containing a real covenant purporting to restrict usage on a parcel of land. The principal issue is whether the United States breached that indenture when it informed third parties that it held a restrictive covenant affecting the parcel.

## FACTS

The following undisputed facts describe the background of this litigation. Not all of them are material, however, to resolution of the issues in dispute. In 1834 the General Assembly of the Commonwealth of Virginia enacted a corporate charter for the Richmond, Fredericksburg and Potomac Railroad Company ("RF & P" or "plaintiff") rendering the company "capable in law of purchasing, holding, selling, leasing and conveying estates—real, personal, and mixed—so far as shall be necessary for the purposes hereinafter mentioned, and no farther." An Act Incorporating the Stockholders of the Richmond, Fredericksburg and Potomac Railroad Company, 1834 Acts, ch. III, p. 127. The charter further provided:

> The president and directors of the said company shall be, and they are hereby invested with all the rights and powers necessary for the construction, repair, and maintaining of a railroad ...; and also to make and construct all works whatsoever which may be necessary and expedient in order to [ensure] the proper completion of the said railroad....

*Id.* at 133–36.

Potomac Yard was constructed and has been operated since early 1900's as a joint facility that has been used by RF & P and other railroads. At the time of its construction, the Washington Metropolitan Area was the principal point of interchange for eastern seaboard traffic moving between northern and southern railroads. Potomac Yard provided a central location for that interchange and provided the tenant railroad companies with essential services, such as train classification.[1]

In 1930 and 1940, Potomac Yard handled approximately 1.5 million freight cars. The Yard was expanded to handle additional traffic during World War II and at its peak in 1943 handled over 2.8 million freight cars. The general post-war decline in rail

---

1. Train classification is the sorting of freight cars from an incoming train and assembling them into other trains for movement to other destinations.

traffic—caused by bankruptcies of several major railroad companies, a restructuring of the railroad industry, and the opening of the Interstate highway system—decreased demand for interchange and classification services at the Yard. In 1987 Potomac Yard handled 968,991 freight cars. New technology also made it possible to handle freight traffic through Potomac Yard with reduced facilities. As a consequence in 1987 one of the two "humps" used for train classification was upgraded to handle all of the Yard's classification needs, and the other hump and its related facilities, including extensive trackage covering a large area of land, was closed.

Starting in 1988, further changes in railroad operations dramatically decreased demand for Potomac Yard's services. Conrail, previously one of the major tenants at Potomac Yard, shifted most of its interchange traffic with Norfolk–Southern Railway and CSXT away from Potomac Yard. In addition, railroads using Potomac Yard developed "pre-blocked" and "run-through" trains to avoid the delay and expense associated with traditional interchange and classification practices, thereby eliminating the need for classification facilities and services at the Yard.

In 1991 Potomac Yard accommodated 573,765 freight cars, only 20 percent of the number of cars that it handled at its wartime peak and only 38 percent of the number that it handled in 1940. Potomac Yard currently requires only limited facilities to service the requirements of its users. In addition to the main tracks, these facilities include several interchange and set-out tracks. These operating facilities now occupy only about 80 acres. When planned reconfiguration of the Yard is completed, approximately 85 acres of the six-mile corridor starting at Long Bridge will be necessary for the main line, side tracks, and related facilities. The remaining land is no longer necessary for railroad operations or will become superfluous when reconfiguration is completed.

After RF & P constructed Potomac Yard in 1906, it became a principal point for interchange and classification of freight traffic along the Eastern Seaboard. In the 1920's railroad companies using Potomac Yard, including RF & P, planned to expand Potomac Yard by constructing additional tracks and other facilities. These additions would be located on land made by filling more of the cove of Four Mile Run.

By 1929 RF & P had acquired title or color of title to additional land and land under water in the cove of Four Mile Run. Beginning in the 1920s, the Government claimed ownership as successor to the State of Maryland of all land, made land, marsh land, and land under water along the western shore of the Potomac River that was below the high-tide line of 1791.

In 1928 the Government began construction of the Mount Vernon Memorial Highway (the "Highway" or the "Parkway") along the western shore of the Potomac River. In 1930 and 1932 RF & P conveyed real property on the western shore of the Potomac River to the Government, including a quitclaim of 198.6 acres in the cove of Four Mile Run, for construction of the Highway and other purposes of the Government. The Government constructed a fill or causeway in the cove of Four Mile Run for the Highway in 1930 on real property quitclaimed to the Government by RF & P.

In January 1932 the Government brought an action in the Supreme Court of the District of Columbia to quiet title on certain land and land under water allegedly comprising a portion of the Potomac River known as Roaches Run or Shallow Bay. *United States v. Robert R. Dye, et al.,* Equity No. 53959 (D.C., filed Jan. 29, 1932). The Government named RF & P as a defendant, as the Government claimed title to nearly 24 acres RF & P alleged to be its own, including 1600 feet of mainline track.

After filing its quiet title action, the Government, through the National Capital Park and Planning Commission (the "Commission"), began negotiations with RF & P. The Government sought a compromise settlement involving land in and near Roaches Run, land near the bridgehead on the western shore of the Potomac River, and land in and near the cove of Four Mile Run. The

Commission's representatives stated that the Government's interests in the quiet title action were to extinguish a recent Virginia land grant to some private parties and to protect the scenic views from the Highway. RF & P's objective was to clear its title to areas needed for the expansion of Potomac Yard and other railroad-related facilities.

Minutes of the July 20, 1933 meeting of the Board of Directors of RF & P reflect that the Commission approved a "draft agreement" of "settlement of title to property along Potomac River" subject to the passage of legislation authorizing the Government to enter into the settlement. The draft agreement recommended settlement of all claims and counterclaims regarding the true boundary between the property owned by RF & P and the Government along the Virginia shore of the Potomac River between the Highway Bridge and a point south of Four Mile Run. Pursuant to the settlement, RF & P would quitclaim or convey certain areas and easements to the Government in exchange for quitclaims, quitclaims subject to restrictions, and easements on other areas.

The draft agreement described Areas F, 6, G, H, and 3 as in or near the cove of Four Mile Run. The draft agreement provided for a quitclaim of Area F by RF & P to the Government. The draft agreement provided for a quitclaim and deed of Areas G and H by RF & P to the Government of "[a]n easement and deed restriction" and a grant of "all such rights, including easements, privileges and appurtenances of every name and nature as may be necessary to give full force and effect forever to ... restrictions" to Areas G and H. The easements, restrictions, and rights were to enable planting "necessary for protection of the views over said land from the Mount Vernon Memorial Highway" and to prevent erecting any building, structure, or sign "visible from the Mount Vernon Memorial Highway after the planting ... is completed" without prior written consent of the Director of Public Buildings and Public Works.

In Area 6 the "draft agreement" provided for a quitclaim by the Government to RF & P of Area 6 " 'for railroad purposes only' and subject to the restrictions and covenants running with the land" applicable to Areas G and H. This quitclaim was in consideration of: "[t]he previous quitclaim of 198.60 acres by the Railroad to the United States for the Mount Vernon Memorial Highway; ..., [a]greement by the Railroad to begin construction of the fill for its proposed tracks and yard across Four Mile Run at the eastern edge of said parcel and to complete the said eastern portion of said fill to permit planting on Area 6 ... before filling the remainder of Area 3, ..." and "[t]he rights of said Railroad to tracks and improvements previously made in good faith upon such area." Finally, the "draft agreement" provided for a quitclaim by the Government to RF & P of Area 3 " 'for railroad purposes only' ... [f]or main line and freight yard across Four Mile Run."

An Act of June 4, 1934, ch. 375, 48 Stat. 836, authorized the Secretary of the Interior, with the approval of the Commission and the Attorney General, on behalf of the Government, by way of compromise when deemed to be in the public interest, to make and accept conveyances, including deeds of quitclaim and restrictive and collateral covenants, of lands in dispute in, under, and adjacent to the Potomac River. After the passage of the 1934 legislation, the Government commenced a review of the proposed agreement with RF & P. Henry H. Glassie was the attorney responsible for that review.

In a letter dated November 1, 1935, Mr. Glassie questioned the enforceability of the draft agreement's proposed restrictions on property to be quitclaimed to RF & P. He wrote "that the restriction for railroad purposes only cannot be made effective if the conveyance is to be a quitclaim merely.... A quitclaim would effectively transfer all the Government's title to the railroad but it would not, I think, bind the land to the restricted purpose contemplated by the par-

ties." [2]

In April 1934 legislation was enacted establishing a District of Columbia–Virginia Boundary Commission (the "Boundary Commission"), which was to recommend an equitable boundary between those jurisdictions. The Boundary Commission concluded in December 1935 that "the fair and proper boundary is the low-water mark on the Virginia shore running from headland to headland across creeks and inlets." *Report of the Dist. of Columbia–Virginia Boundary Comm'n*, H.R.Doc. No. 374, 74th Cong., 2d Sess., at 19 (1936).

In April 1936 Mr. Glassie circulated a draft Indenture which included reverters for Areas 1, 2, 7, and 8. The Government proposed to quitclaim easements or rights of way for railroad purposes, tracks, or tracks and ways in these areas. The draft did not include a provision for a reverter for Areas 3 or 6, and the property interests to be quitclaimed by the Government to RF & P in those areas were not described as easements or rights of way.

RF & P objected to the reverters that were included in the draft Indenture. In a letter dated July 16, 1937, prepared by Mr. Glassie, Assistant Attorney General Carl McFarland defended the necessity for a reverter as to Area 1, stating that "it is of the highest importance to the United States that the use of Area 1 for railroad purposes only ... shall be adhered to and that the reciprocal indenture should contain the customary provision for insuring a use of that character."

On February 12, 1938, the United States, acting by and through Harold L. Ickes, Secretary of the Interior, signed the Indenture with RF & P and its various mortgage trustees. The Secretary of the Interior entered into the 1938 Indenture with RF & P on behalf of the Government and under the authority of the 1934 Act. The Indenture was recorded among the land records of both the District of Columbia and Arlington County, Virginia. The 1938 Indenture was a written "compromise agreement" made "in order to facilitate the settlement of ... claims and controversies and the establishment of the title of the United States of America in and to lands in, under and adjacent to [the] Potomac River by making equitable adjustments of such claims and controversies between the United States of America ... and [RF & P]...."

The 1938 Indenture stated that "for and in consideration of the premises and for the purpose of carrying into effect the provisions of the aforesaid compromise agreement ... and in further consideration of the mutual conveyances, quitclaims, covenants and agreements made reciprocally by and between [RF & P] and [the Government]," RF & P and the Government "respectively grant[ed] and convey[ed] each to the other" stated "propert[ies], estates, rights, interests, easements, servitudes, privileges[,] and appurtenances" and "agree[d] one with the other in manner and form and to the purpose and effect" of the Indenture.

By the 1938 Indenture, the Government "remise[d], release[d] and forever quitclaim[ed] unto [RF & P], its successors and assigns forever, subject to the restrictions, covenants and conditions ... set forth, all right, title, interest and estate, whatsoever, both at law and in equity, of [the Government] in ... [Area 3] marsh land, made land and land under water ... described under the designation of Area 3, ... to be used by [RF & P], its successors and assigns, solely for the construction, maintenance and operation of its main line railroad tracks and ways and a freight yard in connection therewith." [3]

In the 1938 Indenture, "in pursuance of the compromise agreement and for the considerations ... recited," RF & P

covenant[ed] for itself, its successors and assigns, with the United States of America, ... its successors and assigns, that it

---

**2.** Mr. Glassie referred to the Area 3 restrictions as easements.

**3.** Area 3 was composed of the western-most portion of the cove of Four Mile Run. It was located approximately one-half mile west of the Highway and was separated from the Highway by Areas 6 and F.

will not use said area or tract ... quitclaimed to it under the designation of Area 3 for any other purpose than the construction, maintenance and operation by it of its main line railroad tracks and ways and a freight yard in connection therewith; and that [RF & P] will begin the construction of any filling in said Area 3 only at the eastern edge of said area and in order to permit the planting by [the Government] on Area 6 ... will complete the eastern portion of said fill before filling or beginning to fill the remainder of said Area 3 and will not fill in such remainder until such planting on Area 6 shall have been completed.

The quitclaim for Area 3 did not contain a reversionary clause in the event that RF & P ceased or abandoned railroad use of Area 3 or if Area 3 was used for any other purpose. The interest conveyed was not described as an easement or right of way. The Indenture made no provision for prior written consent or approval of any officer or agency of the Government for any use of Area 3.

Plaintiff contends that, unlike the quitclaims and covenants for other areas, RF & P's covenant regarding Area 3 did not run to the benefit of the Highway. Plaintiff claims that the covenant was for the benefit of "the adjacent lands owned by the [Government] and the lands by this indenture conveyed or quitclaimed to [the Government] by [RF & P]," as stated in the Indenture. Defendant maintains that the Highway is within the lands intended to be benefited by the Area 3 restrictive covenant. Defendant also asserts that the benefit of the covenants still runs with the Mount Vernon Memorial Parkway and includes a portion of the George Washington Memorial Parkway as it passes through the indentured areas.

Plaintiff argues that the 1938 Indenture contained a provision for quitclaims of land to RF & P "for railroad purposes only" in order to show that the conveyance was in accordance with the terms of RF & P's corporate charter governing the company's ability to acquire real property. Defendant posits that the court must resolve this as a question of law.

In February 1941 the United States District Court for the District of Columbia, successor to the Supreme Court of the District of Columbia, dismissed the Government's quiet title action against RF & P. *United States v. Robert R. Dye, et al.*, Equity No. 53959 (D.D.C. Feb. 26, 1941) (order of partial dismissal). The order referred to the "compromise agreement" and reciprocal conveyances and quitclaims "pursuant to said compromise agreement." The 1938 Indenture was attached to and made part of the order.

Construction of Washington National Airport ("National Airport") began on fill in the Potomac River east and north of the cove of Four Mile Run before the 1938 Indenture was signed. *See* Act of June 29, 1940, ch. 444, Pub.L. No. 674. 54 Stat. 686, ch. 444 (1940). The official selection of that area as the site for National Airport was announced within months after the execution of the Indenture. Construction of National Airport on that site required shifting the Highway onto land quitclaimed to RF & P in the 1938 Indenture, including Areas 3, F, and 6. The Government, through the Treasury Department, commenced negotiations with RF & P to obtain the necessary land. According to minutes of meetings held by the Commission on March 11–17, 1938, during the negotiations a representative of Treasury's Procurement Division reported that RF & P

tell[s] us they probably in the very near future will expand these yards to the north.... The Railroad Company finally agreed that they would sell to within 100 feet of their proposed track at the end of the east-west runway.... They want 100 feet for protection of this track, and it seems that at some future time there may be some operating buildings or station that they will want opposite the airport. They will guarantee never to sell the land for industrial purposes....

In September 1939 RF & P entered into an agreement with the Civil Aeronautics Authority (the "CAA") by which the Government would acquire 54.59 acres of land,

either by deed or condemnation. The Government proceeded by condemnation, taking fee simple title to the land for $125,000.00. The 54.59 acres condemned by the Government included all of Areas G, H, and 6, and a portion of Area 3.

The Government relocated the Highway onto the condemned area. Until 1947 the relocated portion of the Highway was part of National Airport, administered by the CAA. In that year President Truman added 263.70745 acres of National Airport, including the condemned land, to the Highway to be administered by the National Park Service (the "Park Service"). Exec. Order No. 9851 (May 13, 1947).

Because of the 1939 condemnation, RF & P did not begin construction of fill at the eastern edge of Area 3 until after filling or beginning to fill the remainder of Area 3. At least part of Area 3 to which RF & P retained title was filled by the Government in connection with the relocation of the Highway when National Airport was constructed. The fill of Area 3 by the Government was valued by RF & P at $40,000.00. RF & P thereafter expanded Potomac Yard into this area.

In 1942 RF & P applied for and received permission to build a timber trestle across Four Mile Run. The Commission, commenting by letter of May 26, 1942, on RF & P's application, stated: "The location of the proposed trestle is immediately adjacent to the Mt. Vernon Memorial Highway at a point where it is clearly in view of the traffic using that road...." In 1975 and 1977, the Washington Metropolitan Area Transit Authority ("WMATA") acquired all of RF & P's right, title, and interest to over two acres of land, most of which was within Area 3, under threat of condemnation. WMATA later constructed and now operates a Metro rail line, which is elevated in part, on this land, between the remainder of Area 3 owned by RF & P and the Highway, now part of the George Washington Memorial Parkway. According to the Park Service, it mistakenly failed to require replacement land interest or compensation from WMATA.

In 1943 the CAA erected two large warehouses just west of the Highway and partly within its right of way lines. The Park Service later acquired jurisdiction over the buildings, which became known as the White House Warehouse. In 1989 the Park Service purchased the warehouse property, comprising approximately 4.9 acres, and including a portion of Area 3, from RF & P for $5.1 million. In negotiating the terms of this purchase, the Government made no claim that the portion within Area 3 was restricted in use. Defendant contends that the part of Area 3 in question comprised only a small part of the land involved in the negotiations and did not enter into the negotiations until the end. After purchasing the land, the Park Service constructed new, larger buildings on the site.

In 1978 RF & P contested a Virginia State Corporation Commission tax valuation. In its brief RF & P contended that various land parcels should not have been taxed at fee simple value. RF & P pointed out that

> [a]ll right, title, interest, and estate whatsoever in this area was quitclaimed by the United States to RF & P, for railroad purposes only, with the express covenant that RFfP [sic] would not use the area for any purpose other than the construction, maintenance and operation by it of its main line railroad tracks and ways and a freight yard in connection therewith....

Appellant's Opening Brief at 12, *Richmond, F. & P. R.R. v. State Corp. Comm'n*, Record No. 780073, filed Apr. 4, 1978 (Va.). RF & P presented evidence from an expert title examiner who

> was of the opinion that the Company's right of enjoyment of the parcels was restricted to railroad uses ... '[As to Area 3] you have conveyance of the fee restricted [to] railroad use.... The parcels would be unmarketable except perhaps to another railroad company....

*Id.* at 13–14.

In 1986 Congress authorized the transfer of operating responsibility for National Airport to a local airport authority. In 1987

the Government leased the airport to the Metropolitan Washington Airports Authority, which had been created by Virginia and the District of Columbia by compact with congressional approval, for an initial term of 50 years. The property at National Airport covered by this lease includes most of Area F, quitclaimed by RF & P to the Government in the 1938 Indenture, as well as part of the 198.6 acres quitclaimed by the Government to RF & P in 1930 and other land transferred by RF & P to the Government in 1930 and 1932.

In 1987 the Commonwealth of Virginia condemned a portion of Area 3 for the widening and improvement of Route 1, also known as the Jefferson Davis Highway. *Virginia Dep't of Transp. v. Richmond, F. and P. R.R.*, At Law No. 26536 (Cir.Ct. of Arlington Cty.1988) (final order). The Government failed to assert any rights or interest under the 1938 Indenture in the condemnation action. Defendant contends that the Park Service was unaware of the condemnation until this action was filed and therefore was unable to assert any rights in 1987.

Since February 1938 RF & P has used the portions of Area 3 to which it has retained title solely in connection with its mainline railroad tracks and ways and a freight yard in connection therewith. Nevertheless, the parties agree that the conditions in and around Area 3 have changed in the following ways:

1. The Highway is no longer separated from property used by RF & P for railroad purposes by a buffer area, consisting of Areas F and 6, but is instead located on Area 6 and a portion of Area 3 itself.

2. The 1938 right-of-way of the Highway across the cove of Four Mile Run is now a portion of National Airport, and part of this right-of-way and of Area F, quitclaimed to the Government in 1938 as a buffer between the Highway and the railroad, is now an airport parking lot.

3. Plaintiff contends that substantial mixed-use development has been constructed near Area 3, including Crystal City in Arlington County, Virginia.

Plf's Proposed Statement of Uncontroverted Fact filed June 17, 1992, at 14. In a letter dated July 23, 1980 a Deputy Regional Director of the Park Service wrote that the "adjacent development of National Airport and Crystal City have severely impacted and detracted from the scenic quality of the parkway as it was originally designed...."

In a 1989 draft environmental study of the area, the Park Service noted that, although the designers of the Highway had anticipated some land use changes, "they did not anticipate either the dramatic level of change or significant additional changes," particularly in the Gravelly Point–Airport Zone, where "dramatic changes have occurred." In the final environmental study, dated February 1991, the Park Service repeated this language and, responding to comments on the draft, added:

One has only to look at the photographs of the parkway taken in the 1960's to understand the extensive development that has taken place adjacent to the parkway at Crystal City and National Airport. Today the parkway snakes through a narrow alley of buildings that dominate the views from the parkway....

At an April 15, 1988 meeting, a Park Service official informed RF & P and Arlington County representatives that the 1938 Indenture "totally restricts development" on Area 3. However, if RF & P would provide a 500–foot historical setback from the Parkway, the Park Service stated that it would allow RF & P partially to develop the tract in accordance with the desires of Arlington County.

On July 20, 1989, the Park Service requested the Commission to add three parcels of land held by RF & P, including Area 3, to the Parkway. The Park Service's request described two of these areas as having been "indentured to the Department of Interior since 1938" and further described the indentures as providing the Park Service with "easements over the properties, with restrictions on building heights and types of uses permitted." The

Park Service subsequently requested that the "indentured properties" be removed from the Commission's agenda.

During this time period, officials of the Park Service made public statements about the effect of the Indenture on Area 3. On August 8, 1989, Park Service officials were reported as stating that the 1938 Indenture "means they have a say—and even veto power" over a development proposed by RF & P for Area 3. According to that report, Park Service officials also said that "easements" embodied in the 1938 Indenture "mean only railroad uses are allowed" on Area 3. Martin Finucane, *Old Rail Pact May Restrict Developers, The Arlington Journal,* Aug. 8, 1989, at A1, A4. In the same article, Jack Benjamin, Deputy Associate Regional Director of the Park Service for the National Capital Region, was quoted as saying that the Park Service's goal in maintaining the "easements" on Area 3 was to protect the scenic value of the Parkway. "Our interest, back in 1938, as it is today, is to protect the scenic and landscape values of the parkway." *Id.* at A4.

In November 1989 federal officials reportedly stated that the Park Service had "an ace in the hole" to prevent RF & P's development of Potomac Greens, a major project proposed for Alexandria, Virginia: "36 acres within nearby Potomac Yard in Arlington that the RF & P owns and wants to develop but that the park service says can [be] used only for railroad purposes under a 1938 agreement." Norman Gomlak, *Park Service Land Swap Irks, Pleases, The Arlington Journal,* Nov. 28, 1989, at A1, A4. According to federal officials, the Park Service "might give RF & P the right to build on the 36 acres if the railroad gives up its right to build a parkway interchange for Potomac Greens." *Id.*

On April 2, 1990, Robert Stanton, the Park Service's Regional Director for the National Capital Region, sent a letter to the General Services Administration ("GSA") regarding a proposal to develop a portion of Area 3 as a site for an office complex for the Navy Department. Copies of the letter were circulated to a number of officials of state and local governments. Mr. Stanton wrote that it had come to the attention of the Park Service "that the General Services Administration is seeking proposals from developers to construct office space for some 10,000 Navy employees" and that "one of the proposals is to occupy lands south of Crystal City and north of Four Mile Run ... partially owned by the RF & P Railroad." In addition, Mr. Stanton stated:

> The purpose of this letter is to inform you that the National Park Service owns restrictive easements over 36 acres of land, now occupied by the RF & P Railroad, directly north of Four Mile Run between the George Washington Memorial Parkway and Route 1. We believe that the easement covers at least part of the proposed office site.

> The restrictive easements which are intended to protect the parkway only allow the property to be used for railroad purposes. . . .

By letter of July 5, 1991, GSA informed RF & P that its proposal for development on Area 3, called Port Potomac, was no longer being considered as a site for the Navy Department's project. GSA's letter gave two reasons why Area 3 failed to meet selection criteria—that hazardous or toxic materials possibly existed on the site, and that

> the title deed to part of the land offered contains a covenant limiting its use to railroad purposes only, which would impact upon the ability to construct the desired structures on the site proposed for the requirement of at least 2,000,000 occupiable square feet. . . .

Notes from a June 3, 1991 meeting conducted by GSA to consider sites for the Navy Department's project described the perceived title problem: *"Port Potomac:* Too difficult to deal w/Park Service/DOI don't consider it unless owner agrees to get consent decree from DOI on use for office space."

On August 10, 1990, RF & P filed a quiet title action in the United States District Court for the Eastern District of Virginia, *Richmond, F. & P. R.R. v. United States,* No. 90–1082–A (E.D.Va., filed Aug. 10,

1990), seeking declaratory relief pursuant to 28 U.S.C. § 2409(a) (1988). RF & P requested extinguishment of the restrictive covenant or, in the alternative, a declaration that the covenant only required partial use of Area 3 for railroad purposes. On November 2, 1990, in an unpublished opinion, the District Court dismissed the case based on the statute of limitations. The Fourth Circuit affirmed, and the Supreme Court denied plaintiff's petition for *writ of certiorari. Richmond, F. & P. R.R. v. United States*, 945 F.2d 765, 770 (4th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992).

Plaintiff filed suit in the United States Claims Court alleging a breach of the 1938 Indenture and requesting a declaratory judgment that

> RF & P has the legal and equitable right to develop and use Area 3 for purposes other than its mainline railroad tracks and ways and a freight yard without regard to the restriction in the quitclaim of Area 3 by the United States and the covenant on Area 3 entered into by RF & P in the 1938 Indenture....

Compl. filed Aug. 10, 1990, at 15. On May 21, 1991, plaintiff filed its Amended Complaint changing the type of relief requested. In the Amended Complaint plaintiff alleged two counts: breach of contract and a taking by the United States.[4]

## DISCUSSION

This case presents the court with four discrete issues for decision: first, whether plaintiff's simultaneous filing of complaints on the same operative facts in this court and another federal court compels dismissal of its Claims Court complaint under 28 U.S.C. § 1500 (1988), when the other federal court has since dismissed plaintiff's complaint on jurisdictional grounds; second, whether the statute of limitations has run on a breach of contract claim where the contact at issue was signed in 1938 and presented disputed land use restrictions; third, whether plaintiff properly alleges a taking where the Government asserts a restrictive covenant over land use in an area slated for commercial development; fourth, whether a 1938 covenant between plaintiff and the Government operates to restrict land use in a parcel conveyed by the United States to plaintiff when the covenant purports to restrict the parcel to railroad tracks and a freight yard.

### I. *Jurisdiction*

#### 1. 28 U.S.C. § 1500

Defendant asserts that 28 U.S.C. § 1500 divests the United States Court of Federal Claims of jurisdiction because plaintiff simultaneously filed complaints in the Claims Court and the United States District Court for the Eastern District of Virginia. Defendant contends that, although the causes of action differ, both cases arise from the same operative facts. Defendants invoke the rule announced in *UNR Industries, Inc., v. United States*, 17 Cl.Ct. 146 (1989), *aff'd*, 962 F.2d 1013 (Fed.Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 373, 121 L.Ed.2d 285 (1992), contending that the Claims Court must dismiss plaintiff's complaint with prejudice.

Plaintiff does not refute defendant's contention that 28 U.S.C. § 1500 controls this case. Rather, plaintiff characterizes defendant's argument as dilatory, given an April 18, 1991 status conference in which defendant's previous counsel assured the court that defendant would not assert a section 1500 defense. In the alternative, plaintiff proposes that the court dismiss the action without prejudice and allow plaintiff to refile its complaint. By order dated October 28, 1992, and as announced at oral argument, the court declines to follow the parties' suggestions in this regard.

 *UNR Industries* divests the court of jurisdiction if the same claim is pending in another court at the time a complaint is filed in the Claims Court or is subsequently brought in another court. 962 F.2d at 1021. Two lawsuits involve the same claim if they are based on the same operative facts. *Id.* at 1024. The purposes behind this firm rule are two-fold: 1) "to force an election of forum and [2] to prevent simul-

---

**4.** The breach of contract claim largely mirrored the previous request for declaratory relief.

taneous dual litigation against the government...." *Id.* at 1021. While holding that dismissal is the appropriate disposition when a plaintiff forces the Government simultaneously to defend two suits, the Federal Circuit did not intimate whether such a dismissal should be with or without prejudice. A dismissal for lack of subject matter jurisdiction, however, typically signifies a dismissal without prejudice. *See Scott Aviation v. United States,* 953 F.2d 1377, 1378 (Fed.Cir.1992) (holding that "[w]ithout jurisdiction, the Claims Court cannot presume to dismiss the complaint with prejudice...."").

■■■ Plaintiff simultaneously filed suits in two federal courts based on the same operative facts. The Virginia federal court dismissed plaintiff's case on November 2, 1990, on the ground that plaintiff had not brought its case within the 12–year statute of limitations provided for in the Quiet Title Act, 28 U.S.C. § 2409a(g) (1988). *Richmond, F. & P. R.R. v. United States,* No. 90–1082–A (E.D.Va. Nov. 2, 1990) (citing 28 U.S.C. § 2409(g)). Dismissals on the basis of a lack of subject-matter jurisdiction are without prejudice and, therefore, are not an adjudication on the merits. Consequently, the Court of Federal Claims could not refuse to entertain the case if plaintiff satisfied the statutory requirements for suit in this court.

Although *UNR* would apply to this case, were the court to dismiss the amended complaint on jurisdictional grounds, the dismissal would be without prejudice to plaintiff's immediately refiling a new complaint, since the statute of limitations would not have run on plaintiff's claim on the date of dismissal, as discussed in the next section of this opinion. Obviously, with no suit pending in any other court, a primary consideration motivating the *UNR* decision does not exist: The Government is no longer forced to defend two suits at the same time.

Given the court's resolution of the statute of limitations issue, forcing plaintiff to refile its action would serve none of the purposes outlined in *UNR.* In *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), an alien filed a class action lawsuit challenging a federal statute which mandated, *inter alia,* a permanent residency requirement for Medicare benefits. Defendant filed a motion to dismiss on the ground that, at the time suit was filed, plaintiff had not even attempted enrollment in the Medicare program. Two days later, plaintiff applied for enrollment. The Supreme Court held that, even though filing of a Medicare application was a

> non-waivable condition of jurisdiction, ... [plaintiff] satisfied this condition while the case was pending in the District Court. A supplemental complaint in the District Court would have eliminated this jurisdictional issue; since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact....

426 U.S. at 75 (citations and footnotes omitted). At the court's direction, plaintiff has filed a supplemental complaint alleging, *inter alia,* the dismissal of the Virginia federal court action. Thus, defendant is no longer simultaneously defending two suits based on the same operative facts. Plaintiff has satisfied the jurisdictional prerequisite.

### 2. Statute of limitations

■ Defendant raises a statute of limitations defense pursuant to 28 U.S.C. § 2501 (1988), arguing that "the alleged breach, if it occurred, had to have taken place on the date the Indenture was executed [e.g. 1938]...." In the alternative, defendant argues that plaintiff has known since 1978 of the Department of the Interior's interpretation of the Indenture. Finally, defendant contends that the Virginia court's findings regarding plaintiff's knowledge of the use restrictions preclude the Court of Federal Claims from deciding otherwise.

Plaintiff agrees that the court must look to the date on which the Government allegedly breached the Indenture. But plaintiff asserts that the Park Service breached the Indenture in 1990 or, at the earliest, 1988, when it first asserted possession of land use restrictions on Area 3 land use. Plain-

tiff points out that its 1978 argument to a state taxation body has no legal effect on this issue.

■ "A claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action...." *Oceanic S.S. Co. v. United States*, 165 Ct.Cl. 217, 225 (1964). In particular, a contract claim accrues on the date of the breach, not upon signing of the contract. *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990). The court consequently must determine when defendant allegedly breached the Indenture.

On August 10, 1990, plaintiff filed its complaint in the Claims Court. 28 U.S.C. § 2501 mandates a six-year statute of limitations for claims before the Claims Court, now the Court of Federal Claims. Therefore, defendant must have breached the Indenture, if at all, on or after August 10, 1984, in order to fall within the statute. Plaintiff alleges that defendant first breached the Indenture at an April 15, 1988 meeting between plaintiff, members of the Park Service, Arlington County legal advisors and planning officials. At the meeting the Park Service asserted that the Indenture "totally restricts" development on Area 3. Plaintiff also points to a letter dated April 2, 1990, from Mr. Stanton, the Park Service's Regional Director, National Capital Region, in which he informed the GSA that the Park Service "owns restrictive easements over 36 acres of land.... The restrictive easements which are intended to protect the parkway only allow the property to be used for railroad purposes...."

In this case the court looks to the Government's conduct because it is the Government that allegedly breached the contract.

Plaintiff's representations to the Virginia authorities in 1978 neither manifest its knowledge of a breach nor provide the factors upon which an action for breach could be maintained. Defendant argues that any breach occurred in 1938 because only then could the Government have failed to convey a non-restrictive quitclaim deed. The court cannot agree with this chronology. Plaintiff does not argue that the Government failed to convey unencumbered property in 1938. Rather, plaintiff argues that the covenant contained in the Area 3 portion of the Indenture never served to restrict the area to railroad purposes and that the Park Service breached the Indenture when it asserted otherwise to various land use planning agencies.[5] If the Government breached the Indenture, it did so when it asserted an interest in Area 3 that it did not hold. On this basis the statute of limitations has not expired.

### 3. Taking

■ Defendant argues that plaintiff has not alleged facts sufficient to constitute a taking. Defendant claims that the Government has never asserted exclusive ownership and, therefore, that it has at most only clouded title to plaintiff's property. According to defendant, a mere assertion of an ownership interest cannot amount to a taking and the Court of Federal Claims has no jurisdiction over an action for slander of title. Defendant further points out that the Court of Federal Claims can only declare present ownership in property as a predicate to a claim over which it has jurisdiction. Defendant posits that, if the Government has not taken plaintiff's property, the Court of Federal Claims cannot analyze the state of plaintiff's title to Area 3.

Plaintiff counters that the Government need not claim exclusive present ownership nor physically interfere with property in

---

**5.** Defendant cites *McDonnal v. United States*, 9 Cl.Ct. 629 (1986), for the proposition that the court should look to 1938 as the start of the statute of limitations. In *McDonnal* plaintiff brought an action against the Government for failing physically to convey all the property called for in a deed. By contrast, plaintiff does not allege that the Government failed physically

or legally to convey all of Area 3. Rather, plaintiff argues that the Government intentionally mischaracterized the original intent of the parties by informing various agencies that it had restrictive easement over Area 3. Therefore, the only relevant date for a contract breach is when the parties first differed as to the interpretation of the covenant: 1988.

order to take it. Plaintiff lists the numerous instances wherein the Park Service notified Arlington County officials, land use planners, newspapers, and federal government officials, of the Government's possession of restrictive covenants or easements over Area 3. Plaintiff notes that Mr. Stanton went so far as to claim to the Arlington County zoning board that Area 3 was "partially titled in the United States." According to plaintiff, the net effect of these representations was to absolutely frustrate its efforts to commercially develop Area 3 and, therefore, to take its property.

This case presents one scenario in which plaintiff could possibly assert a taking. "If the Government has wrongfully clouded title to ... [property], and if the plaintiffs have been deprived of some possessory interest in it, then at a minimum they are entitled to assert a temporary taking...." *Oak Forest Inc. v. United States*, 23 Cl.Ct. 90, 97 (1991) (citing *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987)). To find a taking under this scenario, the court must answer two questions: (1) Did the Government possess a restrictive covenant for its benefit such that its representations were a "correct" clouding of title? (resolving this question involves the fourth issue in this case: interpretation of the Area 3 restrictive covenant); and, if not, (2) assuming that plaintiff's arguments regarding the Area 3 covenant are correct, would the Government's activities constitute a deprivation of a possessory interest?

Addressing the second prong,[6] the court finds that the Park Service's activities with respect to Area 3 do not rise to the level of interfering with plaintiff's possessory interest in the parcel. Defendant disputes plaintiff's right under the Indenture to develop Area 3. As such, the Park Service

notified relevant agencies and officials of its legal position.[7] It appears that those same officials and agencies knew of plaintiff's contrary position. However, the Park Service did not claim ownership or title to Area 3. "Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945) (citations omitted). Plaintiff still operates a freight yard in Area 3. It is true that Area 3 no longer serves important and highly profitable rail purposes, but this decline in rail utility does not result from governmental action. Plaintiff still makes substantial economic use of the parcel; any effect of the Park Service's letters and pronouncements is not "so complete as to deprive [plaintiff] ... of all or most" of its interest in Area 3.[8]

More importantly, a line of Court of Claims cases found compensable takings only when the Government claimed title to all or part of land. Even assuming that plaintiff's assertions regarding interpretation of the Area 3 parcel are correct, the Government has only clouded title. Plaintiff asserts that *Yaist v. United States*, 228 Ct.Cl. 281, 656 F.2d 616 (1981), supports its position. In *Yaist* both plaintiff and the Government claimed title to the same parcel of land. In fact, both parties held deeds to the parcel. The court stated that

> [t]he current claim of present ownership, which goes beyond the purpose to acquire property in the future ... or beyond the impact of any reduction in the marketability of property due to possible future acquisition ... is what brings the Government's conduct in this case within our jurisdiction.

**6.** The court addresses the first prong in the context of plaintiff's breach of contract cause of action.

**7.** Plaintiff asserted at oral argument that the Government forced the bringing of this suit in order to exact bargaining concessions with respect to a proposed highway interchange on the Parkway. Plaintiff apparently urges the court to find that the Government's concerns regard-

ing the Area 3 portion of the Indenture were not genuine. The record does not admit of any findings about the Government's motivations.

**8.** The Park Service's assertion of a use restriction on Area 3 seemingly had no effect on plans for a football stadium on part of Area 3. John F. Harris, *GOP Deals Stadium a Major Setback, The Washington Post*, Oct. 7, 1992, at D1.

. . . .

It is the interference with the title to the land through a legally authorized assertion of ownership that constitutes the taking. . . .

228 Ct.Cl. at 287 & n. 4, 656 F.2d at 621 & n. 4 (citations omitted).

▮▮▮▮ *Carlson v. United States,* 214 Ct.Cl. 1, 556 F.2d 489 (1977); *Bourgeois v. United States,* 212 Ct.Cl. 32, 545 F.2d 727 (1976); and *Oak Forest,* 23 Cl.Ct. 90, all involved title disputes between landowners and the Government. Even *Oak Forest,* cited by plaintiff for the proposition that a cloud on title can constitute a taking, involved a dispute over ownership and use of an access road to a parcel of land. 23 Cl.Ct. at 92–93. Moreover, the *Oak Forest* plaintiffs claimed the Government's actions ousted them of all access to their land and "destroyed the value of the entire subdivision." 23 Cl.Ct. at 97–98. Neither circumstance exists in this case. The Park Service has not asserted present ownership over Area 3, and the value of Area 3 has not been destroyed. Rather, the parties argue over the correct interpretation of a clause in a quitclaim deed and covenant. The Park Service's pronouncements to the world, while potentially encumbering the parcel,[9] do not constitute a sufficient interference with plaintiff's possessory interest in property to constitute a taking. Even if the elements constituting a taking otherwise were present, the Government did not wrongfully cloud title, because it interpreted the Indenture correctly.

## II. *Interpreting the 1938 Indenture Agreement*

▮▮▮▮ Normally the Claims Court cannot make a declaration of present title. *Block*

*v. North Dakota,* 461 U.S. 273, 280–81, 286, 103 S.Ct. 1811, 1816, 1819, 75 L.Ed.2d 840 (1983); *Oak Forest,* 23 Cl.Ct. at 96. However, in the context of deciding a plaintiff's Tucker Act right to contract damages, 28 U.S.C. § 1491(a)(1) (1988), the Court of Federal Claims may determine present title. *United States v. Mottaz,* 476 U.S. 834, 842, 849, 106 S.Ct. 2224, 2229, 2233, 90 L.Ed.2d 841 (1986); *Oak Forest,* 23 Cl.Ct. at 96–97.

### 1. Choice of law

▮▮▮▮ Both parties urge the court to use Virginia law to interpret the Indenture. "[T]he great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state . . . is found in the statutes and decisions of the state." *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 155, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944). More specifically, "[f]ederal courts, as a general rule, follow state law rather than federal law in resolving real property disputes. . . ." *Cortese v. United States,* 782 F.2d 845, 849 (9th Cir. 1986) (citing *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 378–79, 97 S.Ct. 582, 591, 50 L.Ed.2d 550 (1977)).[10] The land at issue is located in Virginia. Therefore, the court must use Virginia law to interpret the Indenture.

### 2. Virginia law on interpreting contracts, deeds, and covenants

▮▮▮▮ To properly interpret the Indenture, the court must determine the intention of the parties from the language used

---

9. A government tax lien on property does not constitute a taking. *First Atlas Funding Corp. v. United States,* 23 Cl.Ct. 137, 139 (1991), *aff'd sub nom. First Atlas Funding Corp. ex rel. Kersting v. United States,* 954 F.2d 733 (Fed.Cir.1992). Even filing of a deed in the Government's name, by itself, cannot constitute a taking. *Oak Forest,* 23 Cl.Ct. at 97 n. 4.

10. A limited exception exists allowing application of federal law to land disputes between a private party and the Government. *United States v. Little Lake Misere Land Co.,* 412 U.S.

580, 591–92, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973). The exception does not apply in this case. Although the Indenture's interpretation arguably affects a federal regulatory program (administered by the Park Service), the specific land acquisition at issue here did not arise under a federal regulatory program and, as discussed in the next section of this opinion, the court's conclusion as to the proper interpretation is not hostile to the Park Service's regulatory framework.

in the Indenture. *Camp v. Camp*, 220 Va. 595, 260 S.E.2d 243, 245 (1979). If the agreement is complete and the parties use explicit or unambiguous language, Virginia courts apply the "plain meaning" rule. *Lerner v. Gudelsky Co.*, 230 Va. 124, 334 S.E.2d 579, 584 (1985). This rule provides that where an agreement contains unambiguous language, "the court is not at liberty to search for its meaning beyond [the four corners of] the instrument itself...." *Id.; accord Camp*, 260 S.E.2d at 245. In such contracts the court should not use auxiliary rules of construction, such as parol evidence or "post-deed" circumstances, to interpret the parties' intentions. *Trailsend Land Co. v. Virginia Holding Corp.*, 228 Va. 319, 321 S.E.2d 667, 670–71 (1984) (citing, *inter alia, Camp*, 260 S.E.2d at 245); *see also Berry v. Klinger*, 225 Va. 201, 300 S.E.2d 792, 796 (1983).[11] However, Virginia courts strictly construe against the grantor covenants restricting the free use of land. *Dart Drug Corp. v. Nicholakos*, 221 Va. 989, 277 S.E.2d 155, 157 (1981).

To summarize, the court must first determine whether or not the disputed contract provision for Area 3 is ambiguous. If it is, the court may look to extrinsic evidence to better ascertain the parties' intentions, as long as such evidence does not vary or contradict the provisions in the Indenture. If, however, the Area 3 Indenture provisions are unambiguous, the court must give such terms their ordinary meaning in interpreting the Indenture.

### 3. Ambiguity

■ The Area 3 quitclaim and covenanting language states:

> [The] party of the second part [the United States] does by these presents remise, release and forever quitclaim unto said party of the first part [RF & P], its

successors and assigns forever, for the purposes and *subject to the restrictions, covenants and conditions hereinafter set forth,* all right, title, interest and estate whatsoever, both at law and in equity, of said party of the second part [the United States] in or to the land, marsh land, made land and land under water hereinafter described under the designation of Area 3....

....

And in pursuance of the compromise agreement and for the considerations hereinbefore recited said party of the first part [RF & P], to the intent that the burden of this covenant may run with the lands hereby quitclaimed to it under the designation of Area 3 and that the benefit thereof shall run with the adjacent lands owned by said party of the second part [the United States] and the lands by this [In]denture conveyed or quitclaimed to said party of the second part by said party of the first part, *hereby covenants for itself, its successors and assigns, with the United States of America, said party of the second part, its successors and assigns, that [1] it will not use said area or tract of land, marsh land and land under water hereinabove quitclaimed to it under the designation of Area 3 for any other purpose than the construction, maintenance and operation by it of its main line railroad tracks and ways and a freight yard in connection therewith;* and [2] that said Richmond, Fredericksburg and Potomac Railroad Company will begin the construction of any filling in said Area 3 only at the eastern edge of said area and in order to permit the planting by the party of the second part on Area 6, hereinafter described, will complete the eastern portion of said fill

---

**11.** The Virginia Supreme Court has given varying statements of the rules for interpreting deeds. For example, in *Traylor v. Holloway*, 206 Va. 257, 142 S.E.2d 521, 523 (1965), the court stated that "the purpose or intent of a written instrument must be determined from the language used *in the light of the circumstances under which it was written....*" (quoting *Jernigan v. Capps*, 187 Va. 73, 45 S.E.2d 886, 889 (1948) (emphasis added)); *accord Phipps v.*

*Leftwich*, 216 Va. 706, 222 S.E.2d 536, 539 (1976).

This statement of the law differs from a rule that would confine the court to the four corners of the Indenture. However, the majority of Virginia cases support the "four corners" approach, especially when a contract or deed provision is unambiguous. The "four corners" approach, moreover, represents the more recent line of cases.

before filling or beginning to fill the remainder of said Area 3 and will not fill in such remainder until such planting on Area 6 shall have been completed.

The issue presented is whether the quoted provision unambiguously restricts plaintiff's use of Area 3 to the construction, maintenance, and operation of railroad tracks and a freight yard.

Defendant argues for an affirmative answer, contending that the language establishes an unambiguous perpetual real covenant, the burden of which runs with Area 3 and the benefit of which runs with adjacent land already owned by the Government in 1938 or quitclaimed to the Government as part of the Indenture. According to defendant, the covenant formed part of a comprehensive scheme to protect scenic views from the Parkway.

Plaintiff urges the court to compare the Area 3 quitclaim with others made in the 1938 Indenture. Plaintiff contends that when the Government sought to restrict land use in Areas 1, 2, 7, and 8, it included reverter clauses, whereas the Area 3 covenant includes no reverter. Plaintiff adds that in Areas 4, 5, 6, 8, G, and H, the Indenture specifically granted the Government the right to control the types of buildings permitted and/or the right to control land uses.

As to the covenanting provision, plaintiff notes that the Area 3 covenant, unlike the covenants for Areas 6, 7, and 8, was not "forever hereafter enforceable." Moreover, plaintiff also posits that "the covenant does not require that the entire tract be used for the specified railroad purposes...." Consequently, plaintiff argues, whatever the promise contained therein, the Area 3 covenant did not force a perpetual obligation on RF & P.

Plaintiff distills the following as the dual promise made in the Area 3 covenant: (1) to fill Area 3, which was largely underwater at the time the Indenture was negotiat-

ed and signed, from east to west so that the Government could plant on the adjoining land to the east (Area 6) and (2) to use Area 3 for railroad purposes. Plaintiff argues that the former constitutes the burden on plaintiff (and benefit to the Government), while the latter constitutes the benefit to plaintiff (and the burden to the Government). According to plaintiff, that the Government wished to screen railway operations from the Parkway by requiring plaintiff to fill belies any assertion that restricting Area 3 to railroad use ran to the Government's benefit. Plaintiff contends that it is illogical to conclude that the Government would want a railroad yard in the vicinity of the Parkway. (In any event, plaintiff disputes the validity of the Government's Parkway protection analysis, pointing out that in 1939 the Government moved the Parkway's location, thereby destroying any screening potential in Area 3.) Plaintiff concludes that, since the railroad-purposes restriction was a covenant for its own benefit, plaintiff has the right to discontinue use of all or part of Area 3 as a track and railway yard.[12] Therefore, plaintiff argues, the Park Service's post–1988 assertions to the contrary constitute a breach of the Indenture.

■■■ The court first must address whether it should look to the four corners of the Indenture to ascertain whether the Area 3 provisions are clear and unambiguous or restrict its analysis to the Area 3 provision alone. In *Berry* the Virginia Supreme Court construed contract language with reference to the contract as a whole:

The court must give effect to all of the language of a contract if its parts can be read together without conflict.... The contract must be read as a single document. Its meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties....

**12.** Plaintiff expends considerable effort articulating the historical background and contemporaneous events surrounding this case and Area 3 in particular. The court appreciates the skill and diligence involved in this endeavor. Nevertheless, plaintiff apparently operates on the as-

sumption that the court will look beyond the four corners of the Indenture. As explained above, if the court finds the Area 3 language clear and unambiguous, the court will invoke the "plain meaning" rule.

300 S.E.2d at 796. The court concludes that it must determine ambiguity in the Area 3 Indenture provision with reference to all parts of the Indenture.

■■■ "Ambiguous" means "liable to more than one interpretation" or "uncertain or indefinite." *Webster's II New Riverside University Dictionary* 99 (1984). Thus, the question before the court is whether the Area 3 Indenture provision regarding rail use and a freight yard is "liable to more than one interpretation" or "uncertain or indefinite." Defendant bears the burden of proof because it seeks to strictly construe the provision as a restrictive covenant. *Dart Drug*, 277 S.E.2d at 157. The court concludes that the Area 3 covenant clearly and unambiguously restricts plaintiff's use of Area 3 to railroad tracks and a freight yard.

Plaintiff made two promises pursuant to the Area 3 covenant: 1) to use Area for no other purpose except "construction, maintenance and operation by it of its main line railroad tracks and ways and a freight yard in connection therewith" and, 2) to fill Area 3 subject to certain geographic and time restrictions. These promises do not lend themselves to alternate interpretations: The provisions specifically enumerate Area 3's single allowable use (rail and rail-related), as well as specifying a timetable for filling of its submerged sections (start fill at eastern edge of Area 3 and, after Area 6 planting finished, fill remainder of Area 3).

Plaintiff misconstrues the respective burdens and benefits of the Area 3 covenant. Plaintiff assumes that every covenant must contain reciprocal burdens and benefits. By this logic the Area 3 covenant benefits plaintiff's land because it allows RF & P to use the parcel for rail purposes, but the covenant also benefits the Government's land by providing for a graduated filling of the parcel; the converse would hold as to the respective burdens. While parties may draft covenants that conform to this model, the Area 3 covenant does not. The burden/benefit portion of the covenant states

> that the burden of this covenant may run with the lands ... under the designation of Area 3 and that the benefit thereof shall run with the adjacent lands owned by ... [the Government] and the lands by this Indenture conveyed or quitclaimed to ... [the Government by RF & P]. ...

In other words, the covenant's burden applies to Area 3 only and the covenant's benefit applies only to adjacent lands owned by the Government or conveyed or quitclaimed to the Government by the Indenture, even if not adjacent. Therefore, plaintiff received no benefit in the Area 3 covenant. Conversely, plaintiff undertook all the burden imposed by the covenant. Plaintiff assumed the burden of using Area 3 for a railway uses only, while the Government received the benefit of such a use along with provisions for filling only after the Government planted on Area 6.[13]

■■■ The court concludes that the Area 3 covenant unambiguously allocated its burdens and its benefit.[14] As in *Berry*, plaintiff really

13. Both parties contend that maintenance of railroad tracks and a freight yard cannot be termed a benefit to the Government. How, they query, could maintaining a railroad yard benefit a memorial parkway? First, the Government apparently believed that it could at least screen railway use from the Parkway. For example, the Area 3 covenant referred to plantings on Area 6. Second, "benefit" is a legal term. It does not necessarily imply utility or well-being. The Government's benefit emanates from its acquiring a legal right (to limit uses on Area 3) to which it would not otherwise have been entitled. The argument is largely academic because the covenant states that Area 3 receives no benefit from the covenant. In any event, the court does not conclude that a limitation of Area 3 to railway use was so unlikely to benefit the Gov-

ernment's adjacent lands as to render the covenant's language ambiguous. Of course, the court considers it far more likely that the railroad use provision constitutes the burden to plaintiff and the fill provisions constitute the benefit to the Government. Moreover, the court does not credit completely plaintiff's argument that it had to use Area 3 for railroad purposes. Plaintiff is half correct: Area 3, if used at all, had to be used for railroad purposes.

14. Plaintiff also implies that insofar as the Government quitclaimed all interest in Area 3, the Park Service cannot claim any current interest in the parcel. A quitclaim is a deed "intended to pass any title, interest, or claim which the grantor may have in the premises, but not professing that such title is valid...." *Black's Law*

make[s] no contention that ... [Area 3's] words were of double or doubtful import. Since the words have a clear and plain meaning, ... [plaintiff] merely argues that the parties could not possibly have intended the meaning that they plainly convey ... [RF & P asks] us to adopt a rule permitting extrinsic evidence of the intentions of the contracting parties, regardless of the clarity of the contract language.... We decline the invitation....

300 S.E.2d at 796.

Plaintiff's argument regarding the disparity between the Area 3 conveyance language and language used in other conveyances fails to change the court's analysis of the Area 3 covenant. Plaintiff correctly notes that the Indenture contains other conveyances more specifically restricting land use or providing for reversions in the event plaintiff uses the parcels for non-rail purposes. But the court does not agree with the underlying hypothesis. Plaintiff proceeds as follows: X party conveys nine parcels to Y in a single document. All the conveyances contain covenants or easements for railroad purposes only. Eight of the nine either contain reverters in the event that non-railroad use occurs and/or provide for prior approval of certain building types or heights. One of the nine fails specifically to list prohibited uses or require prior approval for certain building types or heights. Therefore, according to plaintiff, a court must question the enforceability or intent of the parties as to the less-prolix conveyance. This argument provides no basis for either deeming the Area 3 conveyance ambiguous or ignoring its plain meaning.[15]

The conveyances for Areas 1, 2, and 8 provide for easements or rights-of-way and reverters. The parcel at issue, however, contains a restrictive covenant. The court cannot compare Area 3's covenant language with that of an easement. The conveyances are different in kind; covenants do not necessarily contain reverters, while easements frequently do. Plaintiff implies that easements with reverters more effectively restrict property uses, such that the court should discount the restrictive effect of the Area 3 covenant. However, Virginia courts find covenants highly effective means of restricting property, despite the strict construction applied against such encumbrances. *See Hening v. Maynard,* 227 Va. 113, 313 S.E.2d 379, 381–82 (1984) (court equitably enforced a 39–year old restrictive covenant limiting the number of houses allowed on each lot). That the parties negotiated a covenant on Area 3, as opposed to an easement or right-of-way containing a reversionary clause, does not constrain the court to find the language in the Area 3 covenant ambiguous.

Areas 4 and 5 contain restrictive use covenants enumerating uses for which the Government required written consent and approval from the National Capitol Park and Planning Commission and provide for its approval of any building above 60 feet high. By contrast to Area 3, the Area 4 and 5 covenants do not prohibit the specified building uses and heights; they require prior approval for them. Moreover, the Area 4 and 5 covenants do not restrict the parcels to rail use only. The court rules that the covenant on these parcels also differs in kind from that on Area 3.[16]

---

*Dictionary* 1251 (6th ed. 1990). The Government purported to convey whatever interest it had in Area 3. The Government claimed fee simple title, which it attempted to convey. However, the Government, in a separate clause, made the conveyance subject to a restrictive covenant. The court does not consider a quitclaim deed containing such a restrictive covenant contradictory, nor does the court view the quitclaim clause as detracting in any way from the plain meaning of the restrictive covenant.

**15.** Conveyances containing general granting language "for railroad purposes" should be distin-

guished from conveyances containing a real covenant specifically restricting land use to a railroad line and a freight yard. Consequently, whether plaintiff's corporate charter required conveyances for railroad purposes only does not bear on the court's interpretation of a covenant to the same effect.

**16.** In fact, the Area 4 and 5 covenant provides for prior written approval and consent for "any use which may be obnoxious or offensive by reason of the emission of odor, dust, smoke, gas or noise." This would plausibly prohibit rail use without prior approval.

Consequently, these differences do not render the Area 3 covenant ambiguous.

Areas 6, G, and H contain covenants restricting, *inter alia*, any "unsightly conditions" on the parcels and any building, structure, or sign without a National Capitol Park and Planning Commission permit.[17] The covenant also allowed the Government entry to plant in order to protect scenic views from the Parkway. At the same time the covenant required the Government to cooperate in moving the screening if and when RF & P made use of either Area G or H. Plaintiff reiterates its previous argument: Because these land use restrictions are more specific and refer to the Parkway, the court should look skeptically on the Area 3's restrictive, but less prolix, language. However, Area 3 contains more specific restrictions regarding railroad use in particular. In 1938, moreover, Areas G, H, and 6 formed the buffer between Area 3 and the Parkway. As contiguous areas to the Parkway, it would make sense to have explicit provisions in these conveyances allowing government officials entry to plant and to veto buildings or unsightly conditions.

## III. *Changed conditions*

Plaintiff argues, in the alternative, that conditions surrounding Area 3 have changed to such an extent that the court must find the 1938 covenant without effect. According to plaintiff, the Park Service destroyed the park-like setting of the Parkway by constructing National Airport. Furthermore, plaintiff argues, the development of Crystal City, construction of a Metro line, and the Government's erection of large warehouses contiguous to Area 3 all contribute to a change in condition " 'so radical as practically to destroy the essential objects and purposes of the agreement.' " *Hening,* 313 S.E.2d at 382 (quot-

ing *Rombauer v. Compton Heights Christian Church,* 328 Mo. 1, 40 S.W.2d 545, 553 (1931)). If these conditions have changed so radically, the argument goes, then the Government breached the Indenture by asserting the land use restrictions to local officials.

■■■■ The changed conditions doctrine is an equitable doctrine. *See Rombauer,* 40 S.W.2d at 552–53. Plaintiff has filed a breach of contract action. Moreover, a defendant usually invokes the doctrine as a shield to prevent the benefiting party from enforcing the covenant. Instead, plaintiff seeks to use the doctrine as a sword. Virginia courts adopted the doctrine from *Rombauer. See, e.g., Hening,* 313 S.E.2d at 382; *Ault v. Shipley,* 189 Va. 69, 52 S.E.2d 56, 59 (1949); *Booker v. Old Dominion Land Co.,* 188 Va. 143, 49 S.E.2d 314, 317 (1948). In *Rombauer* the court granted partial injunctive relief to prevent erection of a non-residential structure. The court stated:

> The general rule is that equity will enjoin the violation of restrictive covenants, irrespective of the amount of damage which would result from a breach, and even though there be no substantial money damage.
>
> . . . .
>
> When, however the restrictive agreement is induced by the then existing condition[s] ... if a radical change takes place in the whole neighborhood such as defeats the purpose of the restrictions and renders their enforcement inequitable and oppressive, *equity will not enforce them, but will leave the complainant to his remedy at law....*

40 S.W.2d at 552–53 (emphasis added). This passage illustrates how plaintiff is ill-positioned to use the changed conditions doctrine.[18] Even if the court accepted the

---

**17.** The Area 6 conveyance was for "railroad purposes." However the conveyance did not specify those railroad purposes.

**18.** Plaintiff implies that the Government's alleged acquiescence in, or failure to object to, many of the changed conditions estops it from arguing that the restrictive covenant remains in effect. While multiple violations of a covenant

or failure to complain thereof can lead a court to refuse the affirmative enforcement of a restrictive covenant, *Deitrick v. Leadbetter,* 175 Va. 170, 8 S.E.2d 276, 279 (1940); *Harris v. Pierce,* 73 So.2d 330, 333 (La.App.1954), plaintiff again is attempting to use an equitable doctrine as a sword. The issue before the court is not enforcement of a covenant, but, rather, whether defendant has breached a contract. Given the

proposition that plaintiff could use this equitable doctrine against defendant to avoid the Area 3 restrictions, the court cannot grant declaratory relief. *Overall Roofing & Constr. Inc. v. United States*, 929 F.2d 687, 690 (Fed.Cir.1991). Furthermore, the court cannot enjoin the Park Service's attempts to assert a land use restriction, given that plaintiff has not requested such relief, and the court cannot declare present ownership in land absent a present controversy, such as a breach of contract. *See First Atlas*, 23 Cl.Ct. at 139. *See generally Bowen v. Massachusetts*, 487 U.S. 879, 905 n. 40, 108 S.Ct. 2722, 2738, 101 L.Ed.2d 749 (1988); *United States v. King*, 395 U.S. 1, 2–3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969).[19]

## CONCLUSION

Accordingly, based on the foregoing, defendant's cross-motion for summary judgment is granted and plaintiff's motion for partial summary judgment on liability is denied. The Clerk of the Court shall dismiss the amended complaint.

IT IS SO ORDERED.

No costs.

disposition of plaintiff's breach of contract claim, no basis exists on which to estop defendant from asserting its rights under the Indenture.

19. Because the doctrine does not apply to this case, the court need not address defendant's argument concerning choice of law.